## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

<table>
<tr><td>

ANDREW EL-MASSRI,

          Plaintiff,

v.

NEW HAVEN CORRECTIONAL
CENTER, DEPUTY WARDEN
MARMORA, LIEUTENANT
CACIOLI, LIEUTENANT LEWIS,
LIEUTENANT WILLIAMS,
OFFICER HEBERT, OFFICER
McGIVNEY, NURSE GOODE,

          Defendants.

</td><td>

Civil Action No.
No. 3:18-cv-1249 (CSH)

DECEMBER 5, 2019

</td></tr>
</table>

## RULING ON PLAINTIFF'S MOTIONS FOR PRELIMINARY INJUNCTION AND SANCTIONS [Doc. 53 & 61]

**Haight, Senior District Judge:**

## I.  INTRODUCTION

*Pro se* plaintiff, Andrew El-Massri, an inmate currently incarcerated at the Garner Correctional Institution ("Garner") in Newtown, Connecticut, has filed a civil rights complaint pursuant to 42 U.S.C. § 1983 against the New Haven Correctional Center ("NHCC"), where he was previously confined, and seven of the facility's employees in their individual and official capacities: Deputy Warden Marmora, Lieutenant Cacioli, Lieutenant Lewis, Lieutenant Williams, Officer Hebert, Officer McGivney, and Nurse Goode (herein collectively "Defendants").

In brief, El-Massri's claims stem from Defendants' alleged use of physical force and Oleoresin Capsaicin ("OC") spray upon him following an altercation he had with another inmate on

November 26, 2015, at NHCC, where he was then confined as a pretrial detainee. Plaintiff also alleges that Defendants wrongfully refused to allow him to shower for three days thereafter, thereby preventing him from decontaminating himself from the OC spray. He claims that this failure to allow him to shower constituted an unconstitutional condition of confinement and deliberate indifference to his serious medical needs.

Following review of his claims pursuant to 28 U.S.C. § 1915A and the Court's Ruling on Plaintiff's motion to amend his Complaint, the following claims have been allowed to proceed in this action:

(a)     Fourteenth Amendment excessive force claim against Williams, Cacioli, Lewis, and Hebert (along with failure to intervene to prevent such force against Goode and McGivney);[1]

(b)     Connecticut common law civil assault claim against Williams, Cacioli, Lewis, and Hebert;

(c)     Fourteenth Amendment conditions of confinement claim against all individual defendants (Williams, Cacioli, Lewis, Hebert, Goode, McGivney, and Marmora) regarding failure to permit El-Massri to shower for three days;

(d)     Fourteenth Amendment deliberate indifference to serious medical needs against all individual defendants (Williams, Cacioli, Lewis, Hebert, Goode, McGivney, and Marmora) for failure to permit El-Massri to shower for three days; and

(e)     failure to supervise or train against Marmora.

*See El-Massri v. New Haven Corr. Ctr.*, No. 3:18-CV-1249 (CSH), 2019 WL 3491639, at *14 (D. Conn. July 31, 2019).[2] All claims regarding an alleged violation of DOC Administrative Directives

_____

[1] Plaintiff alleges that defendants Goode and McGivney were present at the scene on November 26, 2015, during the alleged "excessive force" incident and did not intervene.

[2] For publication of the Court's "Initial Review Order," *see El-Massri v. New Haven Corr. Ctr.*, No. 3:18-CV-1249 (CSH), 2018 WL 4604308, at *11 (D. Conn. Sept. 25, 2018).

2

were dismissed. "It is well-established that a claim that a state official failed to comply with his own agency's directives, policies, or procedures does not demonstrate the deprivation of a constitutionally or federally protected right." *Id.* at *10 (citations omitted).[3]

The Court also dismissed all claims against defendant NHCC because "[a] correctional institution is not a "person" within the meaning of 42 U.S.C. § 1983." *El-Massri v. New Haven Corr. Ctr.*, No. 3:18-CV-1249 (CSH), 2018 WL 4604308, at *11 (D. Conn. Sept. 25, 2018). Accordingly, there was "no arguable legal basis for proceeding with a § 1983 claim against NHCC." *Id.* Subsequently, the remaining Defendants filed their answer to the amended complaint. *See* Doc. 78.

Pending before the Court at this time are Plaintiff's motions seeking (1) a preliminary injunction [Doc. 53], requesting medical treatment for an ongoing skin disorder, and (2) sanctions for alleged spoliation of video evidence by Defendants [Doc. 61].

## II. DISCUSSION

### A. Motion for Preliminary Injunction

#### 1. *Standard for Preliminary Injunction*

"In this Circuit," the Court of Appeals has "repeatedly said that district courts may grant a preliminary injunction where a plaintiff demonstrates irreparable harm and meets either of two standards: '(a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of hardships tipping decidedly in the

---

[3] *See also El-Massri v. New Haven Corr. Ctr.*, No. 3:18-CV-1249 (CSH), 2019 WL 4942082, at *5 (D. Conn. Oct. 8, 2019) ("Any alleged violations of prison directives or regulations do not give rise to a federal claim, because '[f]ederal constitutional standards rather than state law define the requirements of procedural due process.' ") (quoting *A'Gard v. Perez*, 919 F. Supp. 2d 394, 403 (S.D.N.Y. 2013)).

movant's favor.'" *DONALD J. TRUMP v. DEUTSCHE BANK AG*, No. 19-1540-CV, __ F.3d __, 2019 WL 6482561, at \*4 (2d Cir. Dec. 3, 2019) (quoting *Kelly v. Honeywell Int'l Inc.*, 933 F.3d 173, 134 (2d Cir. 2019)). Moreover, the Second Circuit has emphasized that "irreparable harm" is "a factor required under either standard," 2019 WL 6482561, at \*5.[4] *See also Safran Elecs. & Def. SAS v. iXblue SAS*, No. 19-0567, 2019 WL 5250790, at \*1 (2d Cir. Oct. 17, 2019) ("To obtain a preliminary injunction, a plaintiff must demonstrate: (1) 'either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor'; (2) 'that he is likely to suffer irreparable injury in the absence of an injunction'; (3) that the balance of hardships between the plaintiff and defendant 'tips in the plaintiff's favor'; and (4) that the 'public interest would not be disserved by the issuance of a preliminary injunction.'") (quoting *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010)).

_____

[4] In *DONALD J. TRUMP*, the Second Circuit observed that the Supreme Court included "four components" in its standard for preliminary injunction set forth in *Winter v. Naural Resources Defense Council, Inc.*, 555 U.S. 7 (2008):

> A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.

2019 WL 6482561, at \*7 (quoting *Winter, 555 U.S.* at 20). However, the Second Circuit noted that "[i]t is not clear whether the Supreme Court intended courts to require these four components of the *Winter* standard in all preliminary injunction cases" because the *Winter* case concerned national security issues. *Id.* at \*8. Moreover, the *DONALD J. TRUMP* opinion confirmed that the Second Circuit "did not believe that the Supreme Court had precluded [its] use of the two preliminary injunction standards that [it] had used for five decades." *Id.* (citing *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35-38 (2d Cir. 2010)). The Second Circuit thus reiterated its two standards but also examined *Winter*'s "balance of hardships/equities" and "public interest" components in *DONALD TRUMP*. *Id.* at \*37.

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Moore v. Consol. Edison Co. of New York*, 409 F.3d 506, 510 (2d Cir. 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis and citation omitted)). "Irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *Demirayak v. City of New York*, 746 F. App'x 49, 51 (2d Cir. 2018) (quoting *Bell & Howell: Mamiya Co. v. Masel Supply Co. Corp.*, 719 F.2d 42, 45 (2d Cir. 1983)).[5]

Although it is not typical "to dispose of motions for preliminary injunctions without an evidentiary hearing," such a hearing is "not required in all cases ." *Sugarhill Records Ltd. v. Motown Record Corp.*, 570 F. Supp. 1217, 1222 (S.D.N.Y. 1983) (citations omitted). The Second Circuit has "explained that 'there is no hard and fast rule in this circuit that oral testimony must be taken on a motion for a preliminary injunction or that the court can in no circumstances dispose of the motion on the papers before it.'" *Safran Elecs. & Def. SAS,* 2019 WL 5250790, at *2 (quoting *Md. Cas. Co. v. Realty Advisory Bd. on Labor Relations*, 107 F.3d 979, 984 (2d Cir. 1997)). Where, for example, the briefs provide "an adequate basis for the District Court's decision," the Second Circuit has held that "no hearing was necessary." *Id. See also SCM Corp. v. Xerox Corp.*, 507 F.2d 358, 361 (2d Cir. 1974) (holding district judge did not abuse discretion in finding plaintiff failed to make a sufficient showing of irreparable damage to justify an evidentiary hearing on its motion for preliminary injunction). Also, where issues of fact "are not relevant to the determination of the [preliminary injunction] motion," resolution "without an evidentiary hearing is appropriate."

---

[5] *Cert. denied sub nom. Demirayak v. City of New York, N.Y.*, 139 S. Ct. 1600, 203 L. Ed. 2d 755 (2019).

*Sugarhill Records Ltd.*, 570 F. Supp. at 1221-22 (citing, *inter alia, Herbert Rosenthal Jewelry Corp. v. Grossbardt*, 428 F.2d 551, 554-55 (2d Cir. 1970)). "In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence." *Johnson v. Newport Lorillard*, No. 01 CIV. 9587 (SAS), 2003 WL 169797, at *1 (S.D.N.Y. Jan. 23, 2003).

When the moving party seeks mandatory relief – a remedy that "alters the status quo by commanding some positive act" – he or she must meet a higher standard. *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011) (citation and internal quotation marks omitted). *See also Demirayak*, 746 F. App'x at 51 ("A heightened standard applies when a movant seeks a preliminary injunction that either alters the status quo or would provide the ultimate relief sought in the underlying action.") (citation omitted). A mandatory preliminary injunction "should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from the denial of preliminary relief." *Cacchillo,* 638 F.3d at 406 (citing *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 n.4 (2d Cir. 2010)). *See also Demirayak,* 746 F. App'x at 51 (same). "The 'clear' or 'substantial' showing requirement . . . alters the traditional formula by requiring that the movant demonstrate a greater likelihood of success." *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995) (citation omitted).

Furthermore, the requested injunctive relief must relate to the claims set forth in the complaint. *See De Beers Consol. Mines Ltd. v. United States*, 325 U.S. 212, 220 (1945) ("A preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally"; but an injunction is not appropriate if it "deals with a matter lying

wholly outside the issues in the suit . . . ."). *See also Milner v. Black*, No. 3:16-CV-1621 (SRU), 2017 WL 2661626, at *1 (D. Conn. June 20, 2017) ("[T]he request for injunctive relief must relate to the claims in the complaint."); *Oliphant v. Quiros*, No. 3:09-CV-1771(VLB), 2010 WL 2180780, at *1 (D. Conn. May 19, 2010) ("[T]he petitioner must establish a relationship between the injury claimed in the motion seeking injunctive relief and the conduct giving rise to the action.") (citing *Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14, 16 (4th Cir. 1997)).

The Second Circuit "review[s] denial of a preliminary injunction for abuse of discretion." *DONALD J. TRUMP*, 2019 WL 6482561, at *3 (citing *Ragbir v. Homan*, 923 F.3d 53, 62 (2d Cir. 2019)). "A district court abuses its discretion when it rests its decision on a clearly erroneous finding of fact or makes an error of law." *Almontaser v. New York City Dep't of Educ.*, 519 F.3d 505, 508 (2d Cir. 2008). The district court thus has broad discretion in determining whether to grant or deny preliminary injunctive relief. *Moore v. Consol. Edison Co. of New York*, 409 F.3d 506, 511 (2d Cir. 2005). Additionally, "[i]n the prison context, a request for injunctive relief must always be viewed with great caution so as not to immerse the federal judiciary in the management of state prisons." *Fisher v. Goord*, 981 F. Supp. 140, 167 (W.D.N.Y. 1997) (citing, *inter alia*, *Farmer v. Brennan*, 511 U.S. 825, 846-47 (1994)).

## 2. Substance of Plaintiff's Motion for Preliminary Injunction

At the outset, the Court notes that it did not hold an evidentiary hearing because the briefs, affidavits, and exhibits submitted by the parties were sufficient for the Court to resolve this motion. Moreover, any unresolved factual issues were not relevant to the Court's decision on the motion. Accordingly, for purposes of disposing of the motion, the Court relies on the papers filed by the parties.

Turning to the substance of the preliminary injunction motion, Plaintiff requests "proper treatment and care" by a medical specialist for his "extremely painful skin disorder that is the proximate [result] of [the] [D]efendants' actions" in this case. Doc. 53, at 1. He claims that he suffers from severe itching, redness, and burning on "80% of his body" as a result of the Defendants' use of OC spray on him on November 26, 2015, and their refusal to permit him "proper decontamination." Doc. 53-1, at 1. He seeks "an immediate order for [the Connecticut Department of Correction ("DOC")] to send him to a specialist to treat this recurring skin disorder." *Id.* at 2.

The Defendants filed an objection to El-Massri's motion, arguing that Plaintiff has failed to establish that a preliminary injunction should issue. Doc. 77, at 3-7. First, Defendants assert that the injunctive relief Plaintiff seeks is not related to the underlying claims contained in this action because any alleged failure to treat his skin condition *after* Plaintiff's specified three-day period in November 2015 is not pled in the Amended Complaint. *Id.* at 3. Second, Defendants argue that Plaintiff has not demonstrated that "irreparable harm" will result if no injunction issues. *Id.* at 5-6. Lastly, Defendants maintain that Plaintiff has failed to meet the standard to obtain a preliminary injunction by failing to demonstrate the likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping in his favor. *Id.* at 6-7.

The Court examines Plaintiff's motion and Defendants' objections below and resolves the motion.

### 3. Analysis

#### a. Injunction Requested Fails to Relate to Claims at Issue

In requesting medical treatment, as an inmate, for a skin condition based on an Eighth

Amendment claim for deliberate indifference to serious medical needs, Plaintiff has requested relief which falls outside of his pending claims. He argues that DOC "prison officials" at Hartford Correctional Center ("HCC") and Garner have "left [him] in pain for years" by failing to provide "proper medical attention" for his painful skin disorder. Doc. 53-1, at 1. The injunction he seeks is thus unrelated to the Fourteenth Amendment claims he has made, as a detainee, against the NHCC prison officials in his Amended Complaint. The unconstitutional confinement and deliberate indifference claims in the operative complaint relate to actions by the named Defendant prison officials at NHCC while Plaintiff was a prison detainee. Specifically, those claims allege that on November 26, 2015, while Plaintiff was detained at NHCC, Defendants employed excessive force, used OC spray, and failed to allow him to decontaminate by showering for three days following the incident. Such claims do not include allegations regarding subsequent years of failure by DOC prison officials at HCC and/or Garner to treat an alleged long-term skin condition he has suffered as an inmate.

It is clear that Plaintiff believes that his alleged skin condition originally arose from the November 2015 incident; and in that regard, he will be left to his proof as to the cause of this affliction. However, the injunction he now seeks is unrelated to the allegations set forth in his Amended Complaint. In sum, the claims in Plaintiff's operative complaint relate to the Defendants' actions which he alleges initially caused his skin affliction in November 2015, whereas the requested injunction relates to unnamed DOC officials' long-term treatment of that condition during four years that followed the November 2015 incident. Plaintiff cannot insert new claims into his Complaint with a motion for preliminary injunction.

As set forth in the Court's prior ruling granting Plaintiff leave, in part, to amend his

Complaint, "to the extent that Plaintiff may seek to add a variety of 'deliberate indifference' claims against various defendants by alleging a series of later incidents that may have exacerbated his skin condition after the three-day period in November 2015, those allegations are *beyond the scope of the claims he has pled in this action* and thus disallowed." Doc. 58 (Ruling entered 7/31/19), at 20-21 (emphasis added). There are thus no pending claims regarding deliberate indifference to Plaintiff's serious medical needs arising from actions or events that occurred *after* November 2015. Doc. 77, at 3-4. As Defendants explain, "At first glance, the relief the Plaintiff request[s] [in his preliminary injunction motion] may appear to be related to the claims before the court[;] [h]owever, a review of the Defendants in this case and the subject matter implicated clearly demonstrate[s] that the issue before the court stems from the use of a chemical agent and the defendants' failure to decontaminate [within 3 days following the incident], not from insufficient medical treatment for a skin condition." *Id.* at 4. Therefore, "the request for injunction and the actual controversy before the court are two separate issues." *Id.* at 5.

Upon review of the motion's contents, the Court concludes that Plaintiff's requested injunction addresses matters wholly outside of his claims. *See De Beers Consol. Mines Ltd.,* 325 U.S. at 220. Accordingly, it will be denied.

### b. Failure to Meet Standard for Preliminary Injunction

#### 1. Serious Medical Needs

The Court finds that even if one could properly construe Plaintiff's Amended Complaint to include a claim regarding deliberate indifference to the treatment of his chronic skin condition, and even if he had named defendants who had failed to provide him that treatment, Plaintiff has not met the preliminary injunction standard, much less the heightened standard for a mandatory injunction

against state prison officials. The basic preliminary injunction standard requires a demonstration of either a "a likelihood of success on the merits" or "sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of hardships tipping decidedly in the movant's favor." *DONALD J. TRUMP*, 2019 WL 6482561, at *4; *Safran Elecs. & Def. SAS,* 2019 WL 5250790, at *1. Furthermore, a mandatory preliminary injunction "should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from the denial of preliminary relief." *Cacchillo,* 638 F.3d at 406 (citation omitted). Plaintiff has not met either standard in making his motion.

Under case precedent in this Circuit, the merits of Plaintiff's claim fail because a rash or skin affliction generally does not rise to the level of a "serious medical need."[6] That is, "[a] skin rash is generally insufficient to meet the objective requirement of a sufficiently grave and serious condition giving rise to a deliberate indifference claim." *Thurmond v. Thomas-Walsh*, No. 18-CV-409 (KMK), 2019 WL 1429559, at *6 (S.D.N.Y. Mar. 29, 2019) (quoting *Purdie v. City of New York*, No. 10-CV-5802, 2011 WL 1044133, at *3-4 (S.D.N.Y. Mar. 15, 2011) and collecting cases). *See also Lewal v. Wiley*, 29 F. App'x 26, 29 (2d Cir. 2002) (affirming dismissal of Eighth Amendment claim as appropriate because a "persistent rash" was not a "serious medical condition"); *Reid v. Nassau Cty. Sheriff's Dep't*, No. 13-CV-1192 (SJF) (SIL), 2014 WL 4185195, at *20 (E.D.N.Y. Aug. 20, 2014) (Inmates "Reid and Jovany fail to state a plausible claim for deliberate indifference to a serious medical need because a persistent skin rash or infection does not constitute a 'sufficiently

---

[6] A persistent rash is thus distinguishable from the potentially "serious medical need" occurring during prolonged exposure to OC spray, which may burn a prisoner's eyes, face and skin if he is denied medical treatment. *El-Massri v. New Haven Corr. Ctr.*, No. 3:18-CV-1249 (CSH), 2018 WL 4604308, at *9 (D. Conn. Sept. 25, 2018) (citing *Parsons v. City of New York*, No. 17-CV-2707 (MKB), 2017 WL 2656135, at *3 (E.D.N.Y. June 19, 2017)).

serious' medical need."); *Benitez v. Ham*, No. 04–CV–1159, 2009 WL 3486379, at *11 (N.D.N.Y. Oct. 21, 2009) ("[T]he evidence shows that Plaintiff suffered from a severe body itch. While this condition was undoubtedly unpleasant, it simply does not rise to the level of an Eighth Amendment violation."); *Swindell v. Supple*, No. 02-CV-3182, 2005 WL 267725, at *7 (S.D.N.Y. Feb. 3, 2005) ("skin condition . . . producing excessive itching, scratching, soreness from scratching, and cracked skin" on the plaintiff's arms, legs, and torso, and bleeding on the legs, was not a condition of "an urgent and substantially painful nature as would satisfy the objective prong" – the seriousness of deprivation requirement) (citation omitted)); *Samuels v. Jackson*, No. 97-CV-2420, 1999 WL 92617, at *1-3 (S.D.N.Y. Feb. 22, 1999) (holding that inmate's skin conditions ("papules, vesicles, pustules, burrows, and intense itching" causing "constant scratching of the affected areas, . . . open sores, and abrasions" and making "permanent scars") failed to constitute a sufficiently serious medical condition).

In the case at bar, Plaintiff has stated in his Amended Complaint that he suffers from "an extremely irritating and painful skin disorder" and that the "disorder is a permanent injury and disability that causes burning red inflammation, severe scarring all over his body, and bald spots in his hair." Doc. 76, at 9. Plaintiff does not, however, allege that he is debilitated or that he suffers daily excruciating pain.[7] Rather, he alleges that his rash burns particularly when he takes a shower.[8] Doc. 53-3, at 1. Additionally, in general, Plaintiff appears to be able to function in the prison

---

[7] *Cf. Davis v. Maldonado*, No. 3:17-CV-02145 (JAM), 2018 WL 1258838, at *2 (D. Conn. Mar. 12, 2018) (allowing possibility that a severe rash may be a "serious medical need" if it "caused constant pain and interfered with daily activities").

[8] The Court notes that with respect to showers, in March of 2019, Plaintiff was given a "SEBEX SHAMPOO" to apply when washing to attempt to clear his rash. Doc. 41 ("MD Sick Call" at Garner Correctional Institution, 3/8/2019), at 57.

population and even reported on his motion to proceed *in forma pauperis* that he has held an "administrative" employment position as a "Unit Worker" at the Hartford Correctional Center. Doc. 6, at 3 (¶¶ 5, 6.a).

In the absence of a "sufficiently serious medical need," Plaintiff cannot establish a likelihood of success on the merits or sufficiently serious questions going to the merits (to make them a fair ground for litigation) and a balance of hardships in his favor. As Judge Karas explained in *Thurmond v. Thomas-Walsh*:

> The Court is sympathetic to Plaintiff's contentions that he was in serious pain. However, a skin rash or condition, even one that involves bleeding and scarring, is not a medical condition that gives rise to an Eighth Amendment deliberate indifference claim, even where there are delays in treatment.

2019 WL 1429559, at *7 (citation omitted).

Therefore, even if Plaintiff had included in his complaint a deliberate indifference claim relating to his skin disorder, absent allegations of debilitating, excruciating pain, the claim would fail as implausible.

### 2. Irreparable Harm and Deliberate Indifference

Additionally, even if Plaintiff could show that his rash is atypically severe, giving rise to a "serious medical need," he has failed to present evidence of a key component to obtain a preliminary injunction. That is, he has failed to demonstrate the requisite "irreparable harm." *See Stewart v. U.S. I.N.S.*, 762 F.2d 193, 199 (2d Cir. 1985). "To establish irreparable harm, the movant must demonstrate 'an injury that is neither remote nor speculative, but actual and imminent' and that cannot be remedied by an award of monetary damages."*Shapiro v. Cadman Towers*, 51 F.3d 328, 332 (2d Cir. 1995) (quoting *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir.1989)) .

Here, Plaintiff seeks immediate treatment for a skin condition that has allegedly existed, and been insufficiently treated, for a number of years. Such facts suggest that this medical issue does not present "imminent" or "irreparable harm if the injunction is not granted." *Id.* at 5-6. Plaintiff has gone on with his life as an inmate for four years with this alleged affliction.

Furthermore, the record reflects that Plaintiff has already received medical care for his skin condition on multiple occasions. *See* Doc. 77, at 6; Doc. 77-4 (Ex. D), ¶¶ 16-26. Dr. Gerald Valletta – a medical doctor who is board certified in internal medicine, licensed to practice medicine in Connecticut, and employed by the DOC – testified by affidavit that he has examined Plaintiff's skin on numerous occasions and "[m]ultiple treatments were attempted to address [Plaintiff's] concern of the rash."[9] Doc. 77-4, ¶¶ 2, 18. In November and December of 2018, El-Massri was examined by medical staff due to "complaints of a rash" and "[m]ultiple treatments were attempted." *Id.* ¶¶ 16-18. On February 8, 2019, when examined by Dr. Valletta, Plaintiff complained of "an itchy raised rash" without attributing its cause exposure to OC spray. *Id.* ¶ 19. At that time, a biopsy was taken.[10] *Id.* ¶ 20. In April of 2019, Plaintiff was again examined because he "presented to medical with a rash." *Id.* ¶ 24, 26. Plaintiff was seen by medical staff twice more in April but made no mention of "problems with a rash." *Id.* ¶ 23.

According to Valletta, "in an overabundance of caution," Plaintiff was then given a medical referral for consultation with a dermatologist in May 2019. *Id.* ¶ 25. He was examined on July 15,

---

[9] Dr. Valletta testified that he has nine years of experience working in correctional health care, which includes working at Garner, among other facilities. Doc. 77, ¶¶ 6-7.

[10] Medical records presented by Plaintiff indicate that he received the results of the biopsy in April of 2019. Dr. Valletta wrote on April 8, 2019, that he "discussed results with him (skin biopsy)" and "[d]ermatology consult [was] ordered." Doc. 81, at 12.

2019, but no notes indicate the presence of a rash or "any pain associated with said rash." *Id.* ¶ 26. Plaintiff was thereafter examined by a dermatologist on August 12, 2019. Doc. 77, at 6; Doc. 77-4, ¶¶ 25, 31. Specifically, Valletta testified that El-Massri "was seen by dermatology at UCONN Medical Center on August 12, 2019;" and the consultant agreed with Valletta that Plaintiff has dermatitis but it is "difficult to determine the cause of Plaintiff's condition." *Id.* ¶ 32. "The consult suggested follow up tests, antihistamines and a topical treatment for [Plaintiff's] skin and a follow up [appointment] in two to three months, after a new biopsy is performed." *Id.* ¶ 33. In Valletta's opinion, "[b]ased on [his] review of the medical record," Plaintiff has "received an adequate level of care regarding his complaints of skin rashes." *Id.* ¶ 34. Moreover, if Plaintiff continues to experience discomfort, "he is able to request a sick call and can be evaluated at the time." *Id.* ¶ 35.

Under these circumstances, there appears to be no clear showing that Plaintiff will suffer irreparable harm if the Court does not intervene. Rather, the record reflects a series of ongoing medical treatments without judicial intervention.

In this same vein, the present record does not support a finding that DOC officials have acted with "deliberate indifference" to Plaintiff's rash. To succeed on a "deliberate indifference" claim, a plaintiff must not only show that "the danger posed by the indifference he alleges is 'sufficiently serious,'" he must also prove "that the defendant has acted with 'deliberate indifference to inmate health or safety' in failing to address this danger." *Smith v. Fischer*, 500 F. App'x 59, 61 (2d Cir.2012) (citing *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002)). *See also Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) ("To constitute deliberate indifference, [t]he prison official must know of, and disregard, an excessive risk to inmate health or safety.") (citation omitted). An assertion of mere negligence or even malpractice is not enough to show deliberate indifference;

rather, the plaintiff must allege "a sufficiently culpable state of mind." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (citation omitted). "In medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health. Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Id.* (citing *Wilson v. Switer,* 501 U.S. 294, 302 (1991) and *Farmer v. Brennan*, 511 U.S. 825, 839-40 (1994)). "This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* (citing *Farmer*, 511 U.S. at 836-37).

As the Supreme Court explained in *Estelle v. Gamble*, 429 U.S. 97 (1976):

 [I]n the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.

429 U.S. at 105-06.

In the case at bar, according to Valletta's sworn affidavit testimony, as a doctor and one who has examined Plaintiff, the rash at issue has been treated by DOC medical personnel repeatedly and will continue to be treated. Such documented continuing medical care militates against a finding that Plaintiff's rash has been treated with "deliberate indifference" by DOC medical staff. Also, because Plaintiff is receiving various medical treatments, there is no indication that he will suffer irreparable harm if the injunction does not issue. This is evident because he has been functioning for at least the past four years with this recurring rash.

 El-Massri himself does not dispute that since he filed his motion, he has been evaluated by

a dermatologist at the University of Connecticut Health Center for his skin condition. *See* Doc. 81 (Plaintiff's Reply), at 2. Rather, he contends that he has not received adequate medical treatment. *Id.* at 2-3. He also presents affidavits of other inmates who do not believe they have received adequate medical treatment at Garner, *id.* Exs. F, F1-F3, and a newspaper article from July of 2017 about "inmate health care concerns," and particularly "mental health staffing" issues" at Connecticut's state prisons, *id.* Ex.F-4.

Indeed, Plaintiff may in fact desire a particular medicine or treatment which he has not received. However, "[i]t has long been the rule that a prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment." *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011). "[M]ere disagreement over the proper treatment does not create a constitutional claim." *Id.* (quoting *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir.1998)). *See also Riddick v. Maurer*, 730 F. App'x 34, 38 (2d Cir. 2018) ("[T]he essential test is one of medical necessity and not one simply of desirability.") (quoting *Hill,* 657 F.3d at 123). Although Plaintiff's skin condition recurs, it appears from the medical records that certain treatments have been effective for periods of time.[11] As a prisoner, even were his requested preliminary injunction within the bounds of his claims, he is not entitled to choose the medical treatment he receives.[12]

Moreover, the medical treatment of other inmates, those inmates' concerns, and/or a newspaper article's generalized discussion of Connecticut prisons' medical care do not constitute

---

[11] The medical notes produced by Plaintiff indicate that his condition has improved on occasion before returning. Therefore, some medical treatments have assisted him on a temporary and/or recurring basis. *See* Doc. 81, at 19 ("Summary for consultant") (Appt. Date 8/12/2019).

[12] Evidence presented by El-Massri indicates that medical staff ordered a medication called Mydroxyline Pamoatl to treat Plaintiff's rash from 4/8/2019 to 5/8/2019. Doc. 53-5 ("Action taken" on "Inmate Request Form" by RN A. DeBarros, dated 5/19/2019).

relevant evidence with respect to Plaintiff's preliminary injunction motion. Evidence is only "relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is *of consequence* in determining the action." Fed. R. Evid. 401 (emphasis added). The medical concerns of other inmates and a newspaper article's general discussion regarding inmate healthcare have no tendency to prove the particular facts regarding Plaintiff's medical treatment.

In the case at bar, the medical records presented by Plaintiff show a history of diagnoses and attempted treatments. *See* Doc. 81, at 23. On one such record, Dr. Valletta's notes are detailed regarding dates of examinations (1/28/2019, 2/15/2019, 4/8/2019) and treatments for "an itchy, raised rash." *Id.* These treatments had included "prednisone/benadryl," a biopsy, and "topical antifungals and steroids." *Id.* Although these treatments did not fully resolve the problem, Valletta notes that on May 14, 2019, Plaintiff "now claims it is getting better." *Id.* Plaintiff also presented a "Consultation Form" from the Dermatology Department at UCONN, dated 8/12/2019, in which the doctor described a "rash on [Plaintiff's] neck, chest, back, extremities[,] . . . palms, soles and face." *Id.* at 19. The doctor concluded that he "consider[ed] biopsy of [a] more recent lesion" and said Plaintiff could take an "antihistamine 1 hour before showering" and apply "Benzaclin daily to [his] posterior neck" for his "acne vulgaris." *Id.* at 19. Clearly, the doctor examined Plaintiff's various rashes and attempted to sort them out and treat them.

In summary, Plaintiff's motion for a preliminary injunction is fatally defective on a number of grounds. First, the remedy sought is beyond the scope of his pending claims against the named Defendants for constitutional violations and state law claims. The party addressed in the preliminary injunction motion, the DOC, its alleged inaction, and the time period cited in the motion all fall

outside Plaintiff's claims. Plaintiff simply attempts to create a new *de facto* claim against the DOC with the conclusory allegation that his rash stemmed from the November 2015 incident with the OC spray.

Second, even if Plaintiff's motion did relate to the claims he asserts in his action, he has made no clear showing of a substantial likelihood of success on the merits, or sufficiently serious questions going to the merits (to make them a fair ground for litigation) and hardship tipping in his favor, with respect to deliberate indifference to his skin disorder. His rash fails to constitute a "serious medical need;" and even if it were sufficiently severe, Plaintiff has failed to show "irreparable harm" from the rash's recurrence and/or prison officials' "deliberate indifference" to his skin condition. Rather, Plaintiff's own evidence confirms that he has continued to function in the prison population while receiving a series of medical treatments over the past four years. Granted, these treatments may not have fully cured his rash as he would have desired. However, as a prisoner, he is not entitled to dictate the form of treatment he receives. His motion for a preliminary injunction will be denied.

**B. Motion for Sanctions for Spoliation of Evidence**

### *1. Standard for Spoliation Sanctions*

Spoliation refers to "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Taylor v. City of New York*, 293 F.R.D. 601, 609 (S.D.N.Y. 2013) (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)). "Where a party seeks sanctions based on the spoliation of evidence, it must establish that the sought-after evidence actually existed and was destroyed." *Skyline Steel, LLC v. PilePro, LLC,* 101 F. Supp. 3d 394, 408 (S.D.N.Y. 2015)

(citations and internal quotation marks omitted).[13]  "In addition, it must show that (1) the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the evidence was destroyed 'with a culpable state of mind'; and (3) the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Id.* (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)).

A federal district court may impose sanctions under Federal Rule of Civil Procedure 37 when a party spoliates evidence in violation of a court order. *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999) (citing Fed. R. Civ. P. 37(b)(2)).  Even without a discovery order, a district court may impose sanctions for spoliation, exercising its inherent power to control litigation. *Id.* (citing, *inter alia, Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-45 (1991)).

"Although a district court has broad discretion in crafting a proper sanction for spoliation," the Second Circuit has "explained that the applicable sanction should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." *Id.* (citation omitted).  In particular, the sanction should be designed to: (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore "the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998) (citations omitted).

With respect to electronically stored information, Federal Rule of Civil Procedure 37(e)

---

[13]  *On reconsideration in part* (on other grounds), No. 13-CV-8171 (JMF), 2015 WL 3739276 (S.D.N.Y. June 15, 2015) (granting Plaintiff's request for attorney's fees and costs in prosecuting spoliation motion but reducing amount of attorney's fees Defendant must pay by 25%).

authorizes a district court to impose sanctions against a party for failing to take reasonable steps to preserve that information in anticipation of litigation. The district court may, among other sanctions, issue a jury instruction that the lost evidence presumably was "unfavorable to the party" at fault if that "party acted with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2)(B).

### 2. Substance of Plaintiff's Motion

In the case at bar, El-Massri filed a motion for sanctions against the Defendants "for spoliation and deliberately tampering with physical evidence," which included their "failure to record [the November 2015] incident as they were obligated to [do] under common law, state law, and their own Connecticut [Department] of Corrections Administrative Directions." Doc. 61, at 1. According to Plaintiff, this spoliated evidence included videos of the incident giving rise to the claims in this case. *Id.* at 2. He alleges that: (1) there are factual inconsistencies between the video evidence he reviewed and various Defendants' written statements about the incident on November 26, 2015, and (2) the Defendants intentionally preserved only portions of the video that were beneficial to them in any future litigation and altered or deleted other portions which support his claims. *Id.* at 2-4, 7-8. In particular, Plaintiff asserts that Corrections Officer Mazzonna actually recorded more of the incident than is depicted on the video. This is allegedly proven by Mazzonna's written statement that he was "directed by Lt. Williams to video-record this incident" and El-Massri was "sprayed by chemical-agent" and "Lewis assisted in [his] decontamination." *Id.* at 3.[14] Plaintiff also alleges that Defendants Cacioli or Lewis caused the video to be altered or deleted during their internal review

---

[14] *See also* Doc. 107, at 15 ("Incident Report - Supplemental Page" by Mazzonna, dated 11/26/2015).

of the video.[15] *Id.* at 4-5. For relief, Plaintiff seeks an order for the Defendants to pay a monetary fine and an "adverse jury instruction for Defendants' deliberate spoliation and tampering of video evidence." *Id.* at 10; Doc. 61-1, at 1.

In response to Plaintiff's motion, Defendants filed an objection, arguing that there is no credible evidence to support El-Massri's claims that the video of the incident was altered in any way in anticipation of this lawsuit. Doc. 80, at 3-5. Defendants note that Plaintiff has speculated that the video, following Plaintiff's altercation with another inmate, originally contained footage of Defendants subduing him and failing to decontaminate him. *Id.* at 3. Plaintiff has also theorized that Defendants deleted portions of the video which allegedly depicted their own "culpable actions." *Id.* at 4. Defendants assert, however, that "Plaintiff supplies no credible evidence to support these claims." *Id.*

Furthermore, Defendants explain why Plaintiff's theory regarding deletions in the video "is highly dubious even under the best of circumstances" –

> [T]he Plaintiff argues that whoever watched the video then took affirmative steps to delete or alter the video to prevent discovery of the original video. This theory appears to be illogical and strains the realms of possibility. The theory Plaintiff posits would require the Defendants to know they were going to be sued, anticipate who the Plaintiff was going to be as there were two inmates involved in the fight, remove the offending information while retaining or splicing back in Lt. Williams['s] sign on and then remove some of the video showing an absence of decontamination and then create a sign on by officer Mazzonna with a fabricated explanation of why there was a break in the video.

Doc. 80, at 4-5.

Defendants suggest that the "more plausible explanation" is that there "was no video that

_____

[15] According to El-Massri, following a brief break, less than one minute, in filming, Officer Lewis signed back onto the camera and stated, "The first camera lost memory and had to be exchanged with a new one." Doc. 61, at 2.

captured the beginning of the fight." *Id.* Instead, the video began when Williams signed on with Mazzonna recording. *Id.* The video then "cut out just prior to the beginning of the decontamination of the Plaintiff" because the recorder had lost power or memory, which "is not uncommon." *Id.* When Mazzonna recommenced filming, the problems with the camera's memory were noted to explain why there was a break. *Id.* It thus follows that "although there is an absence of [or break in the] video there is no destruction of evidence." *Id.* The failure to create evidence does not equate with destruction or spoliation. *See R.F.M.A.S., Inc. v. So*, 271 F.R.D. 13, 40 (S.D.N.Y. 2010) ("[A] failure to create records – as opposed to the destruction of records that were kept – is not spoliation."). Defendants thus conclude that Plaintiff has failed to establish that spoliation occurred.

El-Massri filed a reply, stating that the Defendants' failure to comply with DOC Administrative Directives in preserving video footage and their false statements that "this video is a true and accurate depiction of the incident" sufficiently establish his spoliation claim. Doc. 82, at 1-4; Doc. 81, at 2-4.

### 3. Analysis

The Court has reviewed the two videos at issue and there is no apparent evidence to support El-Massri's claim that Defendants altered or destroyed portions of them.[16] First, there is no evidence that any videoed material was deleted or removed. El-Massri claims that the Defendants were in possession of the video "for five hours and twenty-nine minutes following [the] incident," which was "[m]ore than enough time to alter or delete footage of their misconduct." Doc. 61, at 7. The fact that time elapsed is not proof that particular actions occurred during that interval. The allegation that

---

[16] The Defendants submitted the videos with their "Motion to Seal" [Doc. 101] (filed 11/12/2019), filing a sealed copy [Doc. 103] as Exhibit A to their Objection [Doc. 102] to Plaintiff's motion to compel [Doc. 94].

video was altered during that time frame is entirely speculative, lacking any evidentiary support. While there may have been events relevant to El-Massri's claims that were not recorded during what El-Massri describes as a "less than one minute" break between the two videos made, *id.* at 4, there is no evidence that any of the Defendants destroyed video or intentionally refused to record events in an effort to conceal misconduct.[17]

Furthermore, Plaintiff makes much of the fact that Officer Mazzonna's report of the November 2015 incident includes facts that do not appear on the video. Mazzonna stated in the report that upon his arrival, Williams directed him to begin "video recording this incident," El-Massri was "sprayed by chemical agent and secured by wrist restraints," and Lewis "assisted in decontamination of inmate El-Massri in [the] Charlie Center Shower." *Id.* at 3. El- Massri contends that Mazzonna's "written statement/report is direct evidence of spoliation as this video does not show this officer's depiction of [the] recording." *Id*. In particular, there is no video of Plaintiff being sprayed or decontaminated. However, the fact that Mazzonna's report contains additional information that is not shown on the video does not prove that he is lying when recollecting about that day. It also does not show that portions of the video were destroyed. Rather, Mazzonna's statement may contain additional facts which he recalled from being present at the scene. After all, there was only one brief break in the video, which Lewis explained was due to the camera's loss of memory. Moreover, when the video was being made, the officers did not know which, if either, of

---

[17] According to El-Massri, in the first video, the officers "sign[ed] onto camera one at 4:14, and [Lewis] sign[ed] onto [the] second camera at 4:17." Doc. 61, at 4. Plaintiff concludes that because the first video was 2:44 in duration, there was "less than one minute between both videos." *Id.* The Court notes, however, that the properties of the first video show it was made at 10 minutes after the hour and was 2:44 minutes in duration; and the second video commenced at 18 minutes after the hour. This suggests that, if the properties are correct, the break was approximately 5 minutes in length, which is still a brief interval to replace the video camera and begin recording.

the prisoners in the altercation might bring a lawsuit for the officers' actions in breaking up their fight. Absent proof that said officers took actual measures to destroy relevant videotape, the Court lacks sufficient evidence to conclude that spoliation occurred.

Finally, Plaintiff has later attempted to bolster his claim regarding spoliation by filing a post-brief "Notice," allegedly containing "relevant evidence" that he has "newly obtained." Doc. 107. This evidence, however, is also deficient in proving that spoliation occurred. Plaintiff points to the fact that Defendant Williams confirms in his answer to interrogatories that he was "conducting the sign-on procedure for the first video at 4:10 p.m." Doc. 107, at 11 (¶ 2). Plaintiff also notes that although Mazzonna stated on the video that he was signing on at 4:14 p.m., he wrote in his incident report on November 26, 2015, that the signal regarding Plaintiff's altercation was given at 4:10 pm and he "was directed by Lt. William to video-record this incident." *Id.* at 15. Mazzonna further detailed that Plaintiff was "sprayed by chemical agent" and "Lewis assisted in decontamination of [Plaintiff]." *Id.* From these statements, Plaintiff concludes that the video recording of the incident must have actually begun at 4:10 p.m. and four minutes of spraying and decontamination were destroyed. That conclusion does necessarily follow.

The fact that two officers each signed onto the video at the same time but stated slightly different times, 4:10 pm and 4:14 p.m., does not prove that any portion of the video was destroyed. During an emergency situation involving an altercation, two officers could easily miscalculate the exact time they began recording. Although one or both may have misstated the start time, there is no evidence of a break at the beginning of the recording to suggest deletions or alteration.[18]

---

[18] Stated differences in time may have been due to one or the other officer's misperception or unsynchronized timepieces. Upon review of the videos at issue, the Court observed no irregularities. Officer Mazzonna signs on and states it is 4:14 p.m. and Officer Williams signs on

In addition, Plaintiff now claims that the fact that Officers Lewis and Cacioli gave slightly different reasons why the camera had to be replaced during recording – "default lack of battery space" versus "low on memory," respectively – has nefarious implications. Doc. 107, at 4. However, whether each officer could adequately provide the technical reason the camera stopped working does not prove that any evidence was destroyed. It simply supports a finding that there was a brief and necessary break in the video to replace the camera. There is no relevant evidence that any video during that break was either created or destroyed.

Plaintiff is reminded that an argument may have true premises and still yield a false or unsupported conclusion. By interpreting evidence to arrive at a particular result, one overreaches if other results or consequences of those premises are possible. When the link between the premises and the conclusion is weak, deduction fails. The conclusion does not logically follow. Moreover, if one uses inductive reasoning, making specific observations and forming a hypothesis or theory, the conclusions reached are not logical necessities. There may be unobserved facts or circumstances which invalidate the hypothesis. Focusing on the facts presented, whether using deductive or inductive reasoning, there is no conclusive proof of spoliation in this case. Plaintiff's motion for sanctions and for an adverse inference jury instruction, Doc. 61, will be denied.[19]

---

immediately afterward and says it is 4:10 p.m. There are coughing, heavy breathing, and shuffling noises in the background as they sign on, suggesting that a scuffle with El-Massri may have just terminated. Although one or the other officer is incorrect in stating the exact time, there is no evidence that any video has been altered or deleted.

[19] The Court does not address Plaintiff's arguments regarding Defendants' possible mishandling of the video under the DOC's Administrative Directives because the sole issue with respect to spoliation is whether there was intentional *destruction* of evidence in anticipation of pending or reasonably foreseeable litigation – *i.e.*, not whether Defendants followed specific directives or internal policies for handling "potential criminal physical evidence." *See* Doc. 61, at 5. Defendants may not have followed DOC's particular directives, but there is no proof they

### III. CONCLUSION

Based on the foregoing, Plaintiff El-Massri's motion for preliminary injunctive relief [Doc. 53] and his motion for sanctions for alleged spoliation of evidence [Doc. 61] are both hereby DENIED.

It is SO ORDERED.

Signed: December 5, 2019
        New Haven, Connecticut

*/s/Charles S. Haight, Jr.*
CHARLES S. HAIGHT, JR.
Senior United States District Judge

---

destroyed the videos they handled.