## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

---

| | |
|---|---|
| ANDREW EL-MASSRI, <br><br> Plaintiff, <br><br> v. <br><br> DEPUTY WARDEN MARMORA, LIEUTENANT CACIOLI, LIEUTENANT LEWIS, LIEUTENANT WILLIAMS, OFFICER HEBERT, OFFICER MCGIVNEY, NURSE GOODE, <br><br> Defendants. | Civil Action No. <br> 3:18-CV-1249 (CSH) <br><br><br><br> **OCTOBER 7, 2022** |

---

### RULING ON MOTION FOR SUMMARY JUDGMENT [Doc. 120]

**Haight, Senior United States District Judge:**

## I. INTRODUCTION

Plaintiff Andrew El-Massri, a prisoner in the custody of the Connecticut Department of Correction ("DOC"), filed this civil rights action *pro se* pursuant to 42 U.S.C. § 1983. In his original Complaint, El-Massri sued Deputy Warden Marmora, Lieutenant Cacioli, Lieutenant Lewis, Lieutenant Williams, Correction Officer Hebert, Correction Officer McGivney, and Nurse Goode for violating his Fourteenth Amendment due process rights while he was confined as a pre-trial detainee at New Haven Correctional Center ("NHCC"). In his action, he sought monetary, injunctive, and declaratory relief. Doc. 1 (Complaint), at 8-9. On August 7, 2018, based upon his indigence, the Court granted El-Massri's motion to proceed *in forma pauperis,* without prepayment of fees. *See* Docs. 2, 5-7.

Following review of his claims pursuant to 28 U.S.C. § 1915A, as well as ruling on El-Massri's motion to amend his Complaint, the Court permitted the following individual capacity claims for money damages to proceed in this action: (a) Fourteenth Amendment violation due to "excessive force" against Lieutenant Williams, Lieutenant Cacioli, Lieutenant Lewis, and Correction Officer Hebert (along with failure to intervene to prevent such force against Nurse Goode and Correction Officer McGivney);[1] (b) Connecticut common law civil assault and battery against Williams, Cacioli, Lewis, and Hebert; (c) Fourteenth Amendment violation based on conditions of confinement against all individual Defendants (Williams, Cacioli, Lewis, Hebert, Goode, McGivney, and Marmora) regarding failure to permit El-Massri to shower for three days; (d) Fourteenth Amendment deliberate indifference to serious medical needs against all individual Defendants (Williams, Cacioli, Lewis, Hebert, Goode, McGivney, and Marmora) for failure to permit El-Massri to shower for three days; and (e) failure to supervise or train against Deputy Warden Marmora. *See El-Massri v. New Haven Corr. Ctr.*, No. 3:18-CV-1249 (CSH), 2019 WL 6606457, at *1 (D. Conn. Dec. 5, 2019); 2019 WL 3491639, at *14 (D. Conn. July 31, 2019).

Following the Court's issuance of its "Initial Review Order," Plaintiff moved successfully to amend his complaint to include additional factual allegations in his five permitted claims.[2] Doc. 42, 58. The Defendants now move for summary judgment on all claims in the operative Amended Complaint [Doc. 76]. Doc. 120. They support their motion with a memorandum [Doc. 120-1]; a

---

[1] El-Massri concedes that his claim against Nurse Goode for failure to intervene to prevent the use of excessive force is not appropriate. *See* Doc. 143 (Pl.'s Opp. Memo), at 35-36.  El-Massri had no interaction with Nurse Goode until after the alleged use of excessive force by Cacioli, Williams, Lewis and Hebert had concluded.  Accordingly, the Court will grant summary judgment on that claim against Goode. *See* Parts III.B.4 and IV.B.2.e, *infra*.

[2] Plaintiff also moved to add five new defendants, but that request was denied. *El-Massri v. New Haven Corr. Ctr.*, No. 3:18-CV-1249 (CSH), 2019 WL 3491639, at *12 (D. Conn. July 31, 2019) ("[T]he addition of these five new defendants at this late stage of the proceeding would be unduly prejudicial. Therefore, the motion for leave to amend is DENIED to the extent it seeks to add five new defendants."). *See also* n. 21, *infra*.

statement of material facts under Local Rule of Civil Procedure 56(a)1 [Doc. 120-2]; and evidence, including affidavits and declarations, El-Massri's deposition, and prison incident reports [Docs. 120-4 to 120-17].

In opposition, El-Massri has filed a memorandum [Doc. 143], a statement of facts in opposition under Local Rule 56(a)(2) [Doc. 142], and a supplemental memorandum [Doc. 200] with exhibits. After the Defendants filed a response to his supplemental memorandum, [Doc. 204], El-Massri filed a reply thereto [Doc. 206]. El-Massri's opposition also references the video surveillance evidence (which remains under seal) of events on the relevant date of November 26, 2015. Doc. 103 ("Video 1" and "Video 2").[3]

This Ruling resolves the pending motion for summary judgment [Doc. 120].

## II.     STANDARD OF REVIEW

A motion for summary judgment may be granted only when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a); *see also Redd v. New York Div. of Parole*, 678 F.3d 166, 173–74 (2d Cir. 2012). A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). *See also Scott v. Harris*, 550 U.S. 372, 380 (2007) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'") (citation and internal quotation marks omitted). A fact is "material" if it "might affect the outcome of the suit under governing law." *Liberty Lobby*, 477 U.S. at 248.

The moving party bears the initial burden of demonstrating the absence of a disputed issue

---

[3] *See* Doc. 115 (granting "Motion to Seal" [Doc. 101] camera footage from inside NHCC to protect "safety and security" within a corrections facility).

of material fact. *See Celotex v. Catrett*, 477 U.S. 317, 323 (1986). If the initial burden is satisfied, the burden then shifts to the nonmoving party to present "specific evidence demonstrating the existence of a genuine dispute of material fact." *Robinson v. Concentra Health Servs.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation and internal quotation marks omitted). While the Court must view the record in the light most favorable to the nonmoving party and resolve all ambiguities and draw all reasonable inferences in that party's favor, *Liberty Lobby*, 477 U.S. at 255, the nonmoving party nevertheless "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmovant must support each assertion disputing the veracity of a fact, or indicating the existence of a dispute, with specific citation to the evidentiary record. *See* Fed. R. Civ. P. 56(c)(1).

Because El-Massri is proceeding *pro se*, the Court must read his submissions "liberally" and interpret them "to raise the strongest arguments" that they suggest.[4] *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010). Nonetheless, "[p]roceeding *pro se* does not otherwise relieve a litigant of the usual requirements of summary judgment, and a *pro se* party's bald assertions unsupported by evidence, are insufficient to overcome a motion for summary judgment." *Rodriguez v. Hahn*, 209 F. Supp. 2d 344, 348 (S.D.N.Y. 2002) (citation and internal quotation marks omitted).

### III. FACTS

The following facts are derived from the parties' statements of fact filed pursuant to Local

---

[4] In February 2020, the Court appointed Attorney Benjamin J. Lehberger as *pro bono* counsel for El-Massri "for the limited purpose of facilitating discovery by contacting and interviewing potential witnesses, pursuant to D. Conn. L. Civ. R. 83.10(c)(2)." Doc. 154 ("Ruling" on "Plaintiff's Motion to Appoint Counsel"); *see also* Doc. 157 ("Order Appointing *Pro Bono* Counsel").

Rule 56(a)1 and 2 and evidence in support of those statements. *See* Doc. 120-2 (Defs.' Rule 56(a));

Doc. 142 (Pl.'s Rule 56(a)). The Court's review of the factual background in this matter also

includes examination of the operative, verified Amended Complaint, witness affidavits, video

footage, and the parties' discussion of evidence in their memoranda on the motion.[5]  *See, e.g.,*

Doc. 76 (Am. Compl.); Doc. 120-1 (Defs.' Memo); Doc. 143 (Pl.'s Memo). *See also Colon v.*

*Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit

for summary judgment purposes, and therefore will be considered in determining whether material

issues of fact exist, provided that it meets the other requirements for an affidavit under Rule

56(e).").

## A. **The Incident on November 26, 2015**

El-Massri was housed at NHCC during all times relevant to this matter. Doc. 76 (Am.

Compl.), at 1, ¶ 1. On November 26, 2015, a code was called alerting staff that there was an active

altercation between inmates in the Charlie Unit. Doc. 120-2 (Defs.' Rule 56(a)), at ¶¶ 1, 3. In that

unit, there is a center console where corrections officers are located.[6] *Id.* at ¶ 4. On three sides

surrounding the console, there are rooms with glass walls called day rooms. *Id.* at ¶ 5. Inmates are

permitted to congregate in the day rooms during meals and other recreation time. *Id.* at ¶ 6. The

Charlie Unit center day room is three-sided with two glass walls to enable correction officers to

---

[5] Defendants informed El-Massri of the requirements for filing his papers in opposition to the motion for summary judgement under Local Rule 56. Doc. 120-3. Local Rule 56(a)1 provides: "Each material fact set forth in the Local Rule 56(a)1 Statement and supported by the evidence will be deemed admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)2 Statement required to be filed and served by the opposing party in accordance with this Local Rule, or the Court sustains an objection to the fact." Local Rule 56(a)3 provides that "each denial in an opponent's Local 56(a)2 Statement[] must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial." Thus, the Court may consider any unopposed facts to be admitted if supported by evidence.

[6] The Court notes that Defendants' statement of facts describes a center "counsel," but the Court infers that Defendants meant to say "console."

observe the inmates within that room. *Id.* at ¶ 7. The door to the day room is a sliding door that is operated remotely and controlled by the correction officers within the day room. *Id.* at ¶ 8. Adjacent to the dayroom doors are hallway doors that lead to the cells where each inmate is placed. *Id.* at ¶ 9.

On November 26, 2015, Lieutenants Lewis, Cacioli, and Williams proceeded to the Charlie Unit to respond to the code. *Id.* at ¶¶ 2-3. Correction Officers Hebert and McGivney also responded to the scene. *Id.* at ¶ 33; Doc. 120-7 (Defs.' Ex. D (McGivney Aff.)), at ¶ 5. Lieutenants Lewis, Cacioli, and Williams issued commands to the two fighting inmates, El-Massri and another inmate, to stop fighting. Doc. 120-2 (Defs.' Rule 56(a)), at ¶¶ 3, 10. The Lieutenants maintain that their commands were ignored by the combatants. *Id.* at ¶ 11. [7] *See also* Doc. 120-10 (Incident Report), at 4 (signed statement of Williams that "combatants would not separate upon verbal command").

Lieutenant Lewis deployed the chemical agent "Red Saber MK4," Oleoresin Capsicum ("OC"), through the trap door into the day room. Doc. 120-2 (Defs.' Rule 56(a)), at ¶¶ 12, 94.[8] The Defendants represent that the initial burst of that chemical agent appeared to have no effect on El-Massri and the other inmate as they continued fighting. *Id.* at ¶ 13. El-Massri counters that he and the other inmate had ceased fighting after the initial deployment of the OC and prior to any of the Defendants entering the day room. Doc. 142 (Pl.'s Rule 56(a)), at ¶¶ 12, 14. Thereafter, Lieutenants Cacioli and Williams entered the room and utilized the OC spray again. Doc. 120-2 (Defs.' Rule 56(a)), at ¶ 14; Doc. 120-10 (Incident Report), at 4.

---

[7] El-Massri denies that he ignored the officers' commands. Doc. 142 (Pl.'s Rule 56(a)), at ¶ 11; Doc. 143-1 (Pl.'s Decl.), ¶¶ 8-10.

[8] Red Saber MK4 is OC capsicum and is utilized to subdue an inmate in situations such as this, where the inmates are not responding to direct orders by DOC staff and pose a danger to themselves or others. Doc. 120-2 (Defs.' Rule 56(a)), at ¶ 95; Doc. 120-17 (Lewis Aff.), at ¶¶ 21-22 (sealed as Doc. 120-16 and replaced by Doc. 120-17, *see* n. 16, *infra*).

According to Defendants, El-Massri complied with the verbal direction to lie down on the ground. Doc. 120-2 (Defs.' Rule 56(a)), at ¶ 15. Lieutenant Williams and Correctional Officer Hebert were then able to secure his wrists with restraints. *Id.* at ¶ 16.  Williams and Hebert represent that they then assisted El-Massri to his feet and secured him to a wall. *Id.* at ¶ 17. El-Massri maintains that Williams and Herbert assaulted him while he was restrained and forcefully lifted and slammed him against the wall. Doc. 142 (Pl.'s Rule 56(a)), at ¶ 17.

### B.  Facts re:  Defendants

#### 1.  Lieutenant Williams

Lieutenant Williams was not present during the effort to decontaminate El-Massri from his exposure to the OC spray or El-Massri's subsequent escort to the Restrictive Housing Unit ("RHU") as he was relieved by Correction Officer McGivney and then Lieutenant Lewis. Doc. 120-2 (Defs.' Rule 56(a)), at ¶¶ 18, 19; Doc. 120-4 (Williams Aff.), at ¶¶ 23-24.

"On November 27, 201[5], at 5:10 PM," Lieutenant Williams toured the RHU in his capacity as a lieutenant.[9] Doc. 120-2 (Defs.' Rule 56(a)), at ¶ 22; Doc. 120-4 (Williams Aff.), at ¶ 29. He asserts that he does not recall any requests from El-Massri about needing a shower or having an issue from the effects of the OC spray; he also represents that he was not aware that El-Massri had requested decontamination on November 26, 2015, or that he sought a shower any time during his RHU confinement from November 26 to November 29, 2015. Doc. 120-2 (Defs.' Rule 56(a)), at ¶¶ 20-23. *See also* Doc. 120-4 (Williams Aff.), at ¶¶ 28-30.

In contrast, El-Massri claims that while he was in the RHU, he requested a shower from

---

[9]  At ¶ 22, Defendants' Rule 56(a) Statement asserts that Williams toured the RHU on "November 27, 2019," which would have been four years after the events at bar.  The Court logically infers that the correct year was "2015" so that the tour occurred one day after the OC spray event in issue.  *See* Doc. 120-4 (Williams Aff.), ¶ 29.

Williams. Doc. 142 (Pl.'s Rule 56(a)), at ¶ 21. Specifically, he alleges that "[f]or the next two days, I continued to suffer from migraines and burning skin [and] . . . continued to speak to everyone that passed my door, including nurses, lieutenants, Lewis, Cacioli, and Williams." Doc. 143-1 (Pl.'s Decl.), at ¶ 41.

### 2. Lieutenant Cacioli

After the OC spray was deployed and both inmates were secured, Lieutenant Cacioli oversaw the transport and decontamination of El-Massri's co-combatant. Doc. 120-2 (Defs.' Rule 56(a)), at ¶ 24; Doc. 120-5 (Cacioli Aff.), ¶ 24.

It thus follows that Cacioli did not oversee El-Massri's escort out of the Charlie Unit day room; nor was he present for El-Massri's decontamination or escort to the RHU.  Doc. 120-2 (Defs.' Rule 56(a)), at ¶ 26-28; Doc. 120-5 (Cacioli Aff.), ¶¶ 25-27.  Moreover, Cacioli was not aware of any requests from El-Massri for decontamination on November 26, 2015.  Doc. 120-2 (Defs.' Rule 56(a)), at ¶¶ 29, 32; Doc. 120-5 (Cacioli Aff.), ¶¶ 28, 32.

Lieutenant Cacioli worked in the capacity of lieutenant on the subsequent days of November 26 to 29, 2015, but he asserts that he does not recall any requests from El-Massri "indicating that he was unable to shower or that he had issues with the chemical agent that was utilized on November 26." Doc. 120-2 (Defs.' Rule 56(a)), at ¶ 30; Doc. 120-5 (Cacioli Aff.), ¶¶ 31-32.

Disputing Cacioli's version of the facts, El-Massri maintains that he requested a shower from Cacioli several times during that period of November 26 to 29, 2015. Doc. 142 (Pl.'s Rule 56(a)), at ¶ 30; Doc. 143-1 (Pl.'s Decl.), at ¶¶ 35-37.  In particular, El- Massri claims that he "again expressed that [he] was in pain and . . . struggling to breath[e]," but Cacioli told him "your [sic] not getting a shower for 3 days." *Id.* at ¶ 37.

The RHU log book relevant to the November 26 to 29, 2015, time period indicates that El-Massri was provided with a shower on November 27, 2015, in the morning for over fifteen minutes. Doc. 120-2 (Defs.' Rule 56(a)), at ¶ 31; Doc. 120-12 (dated log book entry, "10:30 Shower in progress" for El-Massri).  Plaintiff, however, "contests the authenticity and probative value" of the log book, suggesting that it was written "in order to cover up the defendants' malicious denial of a shower." Doc. 142 (Pl.'s Rule 56(a)), at ¶ 31.

### 3. Correction Officer Hebert

Correction Officer Hebert, along with Correction Officer McGivney, secured the left side of El-Massri for escort. Doc. 120-2 (Defs.' Rule 56(a)), at ¶ 34; Doc. 120-6 (Hebert Aff.), at ¶¶ 10-11. They were directed to bring El-Massri to the shower for decontamination after exposure to the OC spray. Doc. 120-2 (Defs.' Rule 56(a)), at ¶ 35; Doc. 120-6 (Hebert Aff.), at ¶ 11. Hebert has stated that after El-Massri was cleared for RHU placement, El-Massri did not request further decontamination during his escort to the RHU. Doc. 120-2 (Defs.' Rule 56(a)), at ¶¶ 36, 37; Doc. 120-6 (Hebert Aff.), at ¶ 13.  Hebert also represents that he was not made aware of El-Massri's complaint of itching and burning skin. Doc. 120-2 (Defs.' Rule 56(a)), at ¶ 41; Doc. 120-6 (Hebert Aff.), at ¶ 18.

El-Massri asserts that Correction Officer Hebert was aware that El-Massri had been inadequately decontaminated.  *See* Doc. 142 (Pl.'s Rule 56(a)), at ¶¶ 37-38; Doc. 143-1 (Pl.'s Decl.), at ¶ 30.   He claims that he "spoke to defendant Hebert immediately following his escort [to the RHU] and notified him of severe pain and trouble breathing from chemical agent exposure." Doc. 142 (Pl.'s Rule 56(a)), at ¶ 38; *see also* Doc. 143-1 (Pl.'s Decl.), at ¶ 30.

On the other hand, Hebert has explained that he did not see El-Massri after his placement in RHU, and he did not work in RHU on the dates of November 27, 28 or 29, 2015. Doc. 120-2

(Defs.' Rule 56(a)), at ¶¶ 38-39; Doc. 120-6 (Hebert Aff.), at ¶¶ 15-16, 18.  Plaintiff "admit[s]" that Hebert "did not work in RHU" on those dates. Doc. 142 (Pl.'s Rule 56(a)), at ¶ 39.

### 4. Nurse Goode

RN Goode, who was working on November 26, 2015, was not present during the altercation between El-Massri and another inmate; Goode arrived after OC spray had been deployed. Doc. 120-2 (Defs.' Rule 56(a)), at ¶¶ 43-44; Doc. 120-8 (Goode Aff.), at ¶ 13.  By the time Goode appeared in the day room in Charlie Unit, El-Massri was already restrained. Doc. 120-2 (Defs.' Rule 56(a)), at ¶ 45; Doc. 120-8 (Goode Aff.), at ¶ 14.

Nurse Goode was involved in the follow-up observation and decontamination efforts for El-Massri in the shower and in clearing him for placement in the RHU. Doc. 120-2 (Defs.' Rule 56(a)), at ¶¶ 46, 52; Doc. 120-8 (Goode Aff.), at ¶ 15. Goode, who is familiar with the use of OC spray and "has been exposed to this spray on numerous occasions," "has assessed hundreds of individuals who have been exposed to OC spray." Doc. 120-2 (Defs.' Rule 56(a)), at ¶¶ 47-48; Doc. 120-8 (Goode Aff.), at ¶ 18. Goode has explained that the common symptoms of OC exposure include "irritation of the mucosal membranes, which include the eyes, nose and throat," and at times, a "sensation of having difficulty breathing [which is] a normal reaction to direct exposure to OC spray." Doc. 120-2 (Defs.' Rule 56(a)), at ¶¶ 50-51; Doc. 120-8 (Goode Aff.), at ¶¶ 21, 29.  Goode has further stated that his evaluation of an individual for OC exposure considers whether a person is "suffering from respiratory distress [that is] not consistent with exposure to OC spray," including "audible wheezing, sustained rapid respirations, lack of balance, and [in]ability to communicate verbally." Doc. 120-2 (Defs.' Rule 56(a)), at ¶¶ 60, 64; Doc. 120-8 (Goode Aff.), at ¶ 31. If these factors are present, an individual is brought down to medical for further evaluation. Doc. 120-2 (Defs.' Rule 56(a)), at ¶ 61; Doc. 120-8 (Goode Aff.), at ¶ 32.

Nurse Goode was present to observe that El-Massri was "adequately decontaminated in the shower."[10] Doc. 120-2 (Defs.' Rule 56(a)), at ¶¶ 53-54; Doc. 120-8 (Goode Aff.), at ¶ 25. In particular, Nurse Goode ensured that El-Massri's "eyes were adequately flushed in the shower and [that] the OC spray was removed from his facial area and surrounding area of his mucosal membranes." Doc. 120-2 (Defs.' Rule 56(a)), at ¶ 55; Doc. 120-8 (Goode Aff.), at ¶ 26.[11] Goode maintains that El-Massri's decontamination was consistent with the Administrative Directives in effect at that time. Doc. 120-2 (Defs.' Rule 56(a)), at ¶ 56; Doc. 120-8 (Goode Aff.), at ¶ 27.[12] He has recollected that El-Massri did initially complain of difficulty breathing prior to being decontaminated in the shower, which is consistent with exposure to OC spray. Doc. 120-2 (Defs.' Rule 56(a)), at ¶¶ 57-58; Doc. 120-8 (Goode Aff.), at ¶ 28. However, he assessed that El-Massri "did not present with any signs or symptoms of asthma exacerbation." Doc. 120-2 (Defs.' Rule 56(a)), at ¶ 59; Doc. 120-8 (Goode Aff.), at ¶ 30.

El-Massri admits to the timing of Goode's appearance on the scene on November 26, 2015. Doc. 142 (Pl.'s Rule 56(a)), at ¶¶ 47-53. However, he contests Goode's characterization that he was "adequately decontaminated." *Id.* at ¶ 54. He also argues that Goode's "evaluation . . . was grossly inadequate" and Goode's "review of video[s] to aid in his recollection is not . . . trustworthy," but is rather "clearly self-serving." *Id.* at ¶ 59.

---

[10] Nurse Goode has also reviewed the video surveillance footage of El-Massri's escort to the RHU. Doc. 120-2 (Defs.' Rule 56(a)), at ¶ 52; Doc. 120-8 (Goode Aff.), at ¶ 34.

[11] El-Massri asserts that his facial area was not adequately decontaminated, and that orange-dye chemical agent of the OC spray remained on him after the shower. Doc. 142 (Pl.'s Rule 56(a)), at ¶ 55.

[12] At the time relevant to this action, Administrative Directive 6.5(7)(F) provided that decontamination should be accomplished "as soon as practical" and "shall include at a minimum: (1) flushing of the eyes; (2) a shower and change of clothing; (3) medical attention; and (4) removal of the person from the affected area if possible." Doc. 120-14 (Defs.' Ex. K) (Conn. Dep't of Corr. Admin. Dir. 6.5, effective 11/02/2014), at 7.

As seen in the video footage submitted [Doc. 103], Nurse Goode worked with El-Massri by giving him verbal direction to stabilize his breathing. Doc. 120-2 (Defs.' Rule 56(a)), at ¶ 62; Doc. 120-8 (Goode Aff.), at ¶ 33. Goode represents that El-Massri demonstrated "no audible wheezing or other symptoms or signs that were not consistent with a normal reaction to OC exposure." Doc. 120-2 (Defs.' Rule 56(a)), at ¶ 62; Doc. 120-8 (Goode Aff.), at ¶¶ 34, 36. El-Massri denies these allegations about his breathing, arguing that he "clearly exhibit[ed] severe/acute respiratory distress[,] as evidenced by [the] videos." Doc. 142 (Pl.'s Rule 56(a)), at ¶ 62.

According to Nurse Goode, as seen in the video surveillance, El-Massri was able to manage a flight of stairs from the Charlie Unit to the main corridor without exhibiting obvious asthma exacerbation. Doc. 120-2 (Defs.' Rule 56(a)), at ¶ 63; Doc. 120-8 (Goode Aff.), at ¶ 34. Nurse Goode notes El-Massri "was able to regulate his breathing, did not show signs of wheezing or labored respirations, did not complain of difficulty breathing or chest tightness, and was able to speak in full sentences." Doc. 120-2 (Defs.' Rule 56(a)), at ¶ 63; Doc. 120-8 (Goode Aff.), at ¶ 34.

In addition, Goode observed that El-Massri did not show obvious signs or symptoms of asthma exacerbation or complain of difficulty breathing after he walked up two flights of stairs from the main corridor to the RHU.[13] Doc. 120-2 (Defs.' Rule 56(a)), at ¶¶ 64-65; Doc. 120-8 (Goode Aff.), at ¶¶ 35-36. Furthermore, despite El-Massri's allegations that he complained about persistent pain due to OC exposure, Doc. 142 (Pl.'s Rule 56(a)), at ¶¶ 66-67, 69-70, Goode recalls that El-Massri made no requests for additional decontamination during the period he escorted him. Doc. 120-2 (Defs.' Rule 56(a)), at ¶ 66; Doc. 120-8 (Goode Aff.), at ¶ 37.

---

[13] El-Massri states that he was assisted up the stairs by both Correctional Officers McGivney and Hebert. Doc. 142 (Pl.'s Rule 56(a)), at ¶ 64.

After El-Massri was placed in the RHU, Nurse Goode toured that unit at 11:30 p.m. that evening (November 26, 2015) and "did not note any complaints of an emergent nature." Doc. 120-2 (Defs.' Rule 56(a)), at ¶ 67; Doc. 120-8 (Goode Aff.), at ¶ 38. Further, Goode maintains that at no time did El-Massri make him aware of his alleged "continuing itching or burning skin." Doc. 120-2 (Defs.' Rule 56(a)), at ¶¶ 69, 70; Doc. 120-8 (Goode Aff.), at ¶ 40.  After touring the RHU on November 26, Goode has represented that he did not work in the RHU on November 28 or 29, 2015. Doc. 120-2 (Defs.' Rule 56(a)), at ¶ 68; Doc. 120-8 (Goode Aff.), at ¶ 39.  Plaintiff admits that Goode did not work in the RHU on those dates. Doc. 142 (Pl.'s Rule 56(a)), at ¶ 39.

**5. Deputy Warden Marmora**

On November 26, 2015, Deputy Warden Marmora was working as Deputy Warden for rehabilitative services. Doc. 120-2 (Defs.' Rule 56(a)), at ¶ 71; Doc. 153-2 (Marmora Aff.), at ¶ 4. In this capacity, she has averred that she "oversaw counseling staff, maintenance, records, classification and records, among other duties," but that she "did not have authority or control over custody staff or issues involving custody. Doc. 120-2 (Defs.' Rule 56(a)), at ¶¶ 72, 73; Doc. 153-2 (Marmora Aff.), at ¶ 6. Also, although she worked on November 26, 2015, she was not in the building at the time the events occurred with El-Massri. Doc. 120-2 (Defs.' Rule 56(a)), at ¶¶ 74, 82; Doc. 153-2 (Marmora Aff.), at ¶ 7.

As part of her duties as Deputy Warden, Marmora was assigned to be "a point person for critical incidents that occur[red] after normal business hours" and was to be advised of any events relevant to her duties regardless of the time of the occurrence. Doc. 120-2 (Defs.' Rule 56(a)), at ¶¶ 75, 76; Doc. 153-2 (Marmora Aff.), at ¶¶ 8-9. She was notified by telephone of the incident involving El-Massri as it occurred after hours, and her name is shown on the incident report to reflect that she was contacted. Doc. 120-2 (Defs.' Rule 56(a)), at ¶ 77; Doc. 153-2 (Marmora Aff.),

at ¶¶ 10-11. However, Marmora did not review the incident report (NHCC-2015-11-055) to determine whether the appropriate level of force was used during the incident, and she was not a signatory on the report. Doc. 120-2 (Defs.' Rule 56(a)), at ¶¶ 79, 81; Doc. 153-2 (Marmora Aff.), at ¶ 12. She later reviewed the report to determine if any transfer of inmates or separation profiles were needed. Doc. 120-2 (Defs.' Rule 56(a)), at ¶ 80; Doc. 153-2 (Marmora Aff.), at ¶ 13.

According to Marmora, and as Plaintiff concedes, she was "not present in the building" when the OC spray incident described in report NHCC-201-11-055 occurred. Doc. 153-2 (Marmora Aff.), at ¶ 15. Also, she has asserted that she was "not personally aware" of requests from El-Massri "to shower in an effort to decontaminate [himself] from November 26 to November 29, 2015." Doc. 120-2 (Defs.' Rule 56(a)), at ¶ 83; Doc. 153-2 (Marmora Aff.), at ¶ 16.[14]

### 6. Correction Officer McGivney

The parties concur that Correction Officer McGivney was working second shift on November 26, 2015. Doc. 120-2 (Defs.' Rule 56(a)), at ¶ 85; Doc. 153-1 (Defs.' Ex. D, McGivney Aff.), at ¶ 3; Doc. 142 (Pl.'s Rule 56(a)), at ¶ 85. Preparing El-Massri for escort after the fight, McGivney secured El-Massri's right side and Correction Officer Hebert secured his left side. Doc. 120-2 (Defs.' Rule 56(a)), at ¶¶ 86; 104; Doc. 153-1 (McGivney Aff.), at ¶¶ 9-10. After El-Massri was cleared for placement in the RHU, McGivney escorted him there. *Id.* at ¶12; Doc. 120-2 (Defs.' Rule 56(a)), at ¶ 87. Correction Officer McGivney has averred that El-Massri did not request additional decontamination while McGivney escorted him.[15]  Doc. 153-1 (McGivney

---

[14]  Plaintiff admits he lacks "sufficient knowledge to admit or deny whether Marmora was made personally aware" of his continued problems with OC exposure.  Doc. 142 (Pl.'s Rule 56(a)), at ¶ 83.

[15]  As described *supra*, El-Massri has insisted that he informed all Defendants of his persistent pain and suffering associated with his inadequate decontamination. Doc. 142 (Pl.'s Rule 56(a)), at ¶ 87.

Aff.), ¶ 12.

### 7. Lieutenant Lewis

Lieutenant Lewis, who was working on November 26, 2015, between 4:00 p.m. and 12:00 a.m., is charged with the duty to respond to and supervise emergency situations, including calls for codes. Doc. 120-2 (Defs.' Rule 56(a)), at ¶¶ 88, 89; Doc. 120-17 (Lewis Aff.), at ¶ 4.[16] When he responded to the Charlie Unit day room at approximately 4:10 p.m., Lieutenant Lewis observed El-Massri exchanging punches with another inmate. Doc. 120-2 (Defs.' Rule 56(a)), at ¶¶ 90-91; Doc. 120-17 (Lewis Aff.), at ¶¶ 7-8, 16.

Lieutenant Lewis recalled that despite verbal direction by Lieutenants Williams and Cacioli to the two inmates to stop fighting, the fight continued. Doc. 120-2 (Defs.' Rule 56(a)), at ¶ 92; Doc. 120-17 (Lewis Aff.), at ¶¶ 17-18. "[C]oncerned for the safety of DOC personnel, . . . the co-combatants and other inmates in Charlie unit," Lewis deployed OC spray through the trap door into the day room. Doc. 120-2 (Defs.' Rule 56(a)), at ¶ 93; Doc. 120-17 (Lewis Aff.), at ¶¶ 19-20. However, the OC spray had "no impact on either the Plaintiff or the person he was fighting." Doc. 120-2 (Defs.' Rule 56(a)), at ¶ 96; Doc. 120-17 (Lewis Aff.), at ¶ 23.[17]   Only after Lieutenants Lewis and Cacioli opened the day room doors and directed the OC spray at the combatants' facial areas did the inmates stop fighting. Doc. 120-2 (Defs.' Rule 56(a)), at ¶¶ 100-02; Doc. 120-17 (Lewis Aff.), at ¶¶ 27-28. The inmates then complied with the verbal order to lie on the floor.

---

[16]  The Court notes that Lewis's Affidavit [Doc. 120-17] is sealed so cites only to passages publicly revealed in Defendants' Rule 56(a) Statement of Facts, Doc. 120-2.

[17] El-Massri insists that he "had separated from" the other inmate, whom he refers to as "Casanova-Adorno," "shortly after the first dispersal" of OC spray. Doc. 142 (Pl.'s Rule 56(a)), at ¶ 96.

Doc. 120-2 (Defs.' Rule 56(a)), at ¶ 103; Doc. 120-17 (Lewis Aff.), at ¶ 30. [18]

After he instructed staff to secure El-Massri, Lieutenant Lewis directed El-Massri's escort out of the Charlie Unit day room to the RHU. Doc. 120-2 (Defs.' Rule 56(a)), at ¶ 104; Doc. 120-17 (Lewis Aff.), at ¶ 32. Lieutenant Lewis observed that El-Massri was placed in the shower "to rinse off any spray on his face," as was "consistent with DOC policy."[19] Doc. 120-2 (Defs.' Rule 56(a)), at ¶¶ 105, 106; Doc. 120-17 (Lewis Aff.), at ¶ 34.

Lieutenant Lewis noted that after being evaluated by Nurse Goode, El-Massri was cleared for placement in the RHU. Doc. 120-2 (Defs.' Rule 56(a)), at ¶¶ 107, 108; Doc. 120-17 (Lewis Aff.), at ¶ 35.  Lewis toured the RHU during El-Massri's period of RHU confinement and has stated that he "did not recall any requests from the Plaintiff indicating that he was unable to shower or . . . had issues with the chemical agent." Doc. 120-2 (Defs.' Rule 56(a)), at 111-12; Doc. 120-17 (Lewis Aff.), at ¶ 40.[20]  Upon checking a log book of RHU notes during the November 26 to 29, 2015, time period, Lewis noted that El-Massri was provided with a fifteen-minute shower on the morning of November 27, 2015. Doc. 120-2 (Defs.' Rule 56(a)), at ¶ 113; Doc. 120-17 (Lewis Aff.), at ¶ 41. Lewis was not aware that El-Massri made "any additional requests to decontaminate" during his confinement in the RHU between November 26 and 29, 2015.  Doc. 120-2 (Defs.' Rule 56(a)), at ¶ 114; Doc. 120-17 (Lewis Aff.), at ¶ 42.

Rebutting Lewis's account of the relevant events, El-Massri has alleged that he repeatedly

---

[18] According to El-Massri, because he became compliant shortly after the first dispersal of OC spray, additional dispersal of chemical agent was "unnecessary and thus excessive." Doc. 142 (Pl.'s Rule 56(a)), at ¶¶ 96, 101,103; *see also* Doc. 143-1 (Pl.'s Decl.), at ¶¶ 8-11.

[19] El-Massri has emphasized that the shower was "*only* to flush out his eyes" and "was not a full or proper decontamination" under DOC policy. Doc. 142 (Pl.'s Rule 56(a)), at ¶ 106 (emphasis in original and internal quotation marks omitted).

[20]  *See* n. 16, *supra.*

notified Lieutenant Lewis – immediately following his escort and placement in the RHU, as well as other times – that he needed to shower and was experiencing pain associated with OC exposure and inadequate decontamination. Doc. 142 (Pl.'s Rule 56(a)), at ¶¶ 109, 112, 114. In his deposition, El-Massri stated that he made requests to shower (due to pain from the OC spray) to Lieutenant Lewis at 11:00 p.m. on November 26, 2015, and in the morning of November 27, 2015. Doc. 143-6 (Pl.'s Ex. 37, El- Massri Dep.), at 23:  9-18. According to El-Massri, Lieutenant Lewis refused to permit him to shower on both occasions. *Id.*: 13-23

## IV.    DISCUSSION

In his Amended Complaint**,** El-Massri alleges five claims, four constitutional violations of the Fourteenth Amendment under 42 U.S.C. § 1983 and one state-law claim.[21]  First, he asserts that Defendants Williams, Hebert, Cacioli, and Lewis applied "excessive force" – violating the due process clause of the Fourteenth Amendment – when they responded to the code regarding his fight with another inmate. Doc. 76 (Am. Compl.), at 4, ¶¶ 3-4.  Specifically, El-Massri alleges that Williams and Hebert "slammed [him] onto his face" and Cacioli and Lewis sprayed him unnecessarily with OC spray.  *Id.*  Second, Plaintiff alleges that by these acts, Williams, Hebert, Cacioli, and Lewis also perpetrated "simple assault[s]" and battery against him under Connecticut common law. *Id.*

---

[21] In his Amended Complaint, Plaintiff attempted to name five new defendants (Jose Feliciano, Warden of NCCC; John Doe, Deputy Warden for Security of NCCC; and Officers Mazzona, Harris, Corley). However, he did not include these names in his case caption, as mandated by Fed. R. Civ. P. 10(a). Moreover, in granting him leave to amend this pleading, the Court explicitly ruled:

> As the statute of limitations has expired on El-Massri's claims, the Court agrees that the addition of these five new defendants at this late stage of the proceeding would be unduly prejudicial. Therefore, the motion for leave to amend is DENIED to the extent it seeks to add five new defendants.

*El-Massri v. New Haven Corr. Ctr.,* No. 3:18-CV-1249 (CSH), 2019 WL 3491639, at *12 (D. Conn. July 31, 2019).  Accordingly, *none* of these new defendants are parties in this action.

In his third and fourth claims, El-Massri alleges violations of due process under the Fourteenth Amendment with respect to conditions of his pretrial detainment.  As his third claim, Plaintiff asserts that Defendants Williams, Cacioli, Hebert, McGivney, and Marmora created "unconstitutional conditions of confinement" when they failed to allow him to decontaminate properly by showering after he was exposed to the OC and then denied him the ability to shower for three days while he was confined in the RHU. *Id.* at 6-8, ¶¶ 7-10.  As to his fourth claim, El-Massri alleges that these Defendants displayed "deliberate indifference to his serious medical needs" by failing to allow him to decontaminate himself by showering to remove the OC spray. *Id.* at 6-9, ¶¶ 7-11.

Finally, in his fifth claim, Plaintiff alleges that Deputy Warden Marmora failed to supervise or train correctional staff, resulting in their use of "excessive force."  In particular, she condoned the correctional officers' violent conduct against him on November 26, 2015, by writing a report after the incident that stated that the use of force against El- Massri was justified.  *Id.* at 9, ¶ 12. In El-Massri's view, Marmora either perpetuated or created a policy or custom under which unconstitutional practices occurred and was aware that this policy was used against him. *Id.* at ¶ 13.

Defendants move for summary judgment on all claims. Doc. 120.  Specifically, they seek judgment as a matter of law on the merits of El-Massri's constitutional "excessive force," conditions of confinement, medical indifference, and failure to supervise claims, as well as his state law assault and battery claim. Doc. 120-1 (Defs.' Memo), at 5-20. The Defendants also assert that qualified immunity shields liability for:  the use of OC by Lieutenants Lewis and Cacioli, the application of force by Correction Officer Hebert and Lieutenant Williams, and any failure of the Defendants to afford El-Massri a shower for three days while he was confined in the RHU. *Id.* at

20-26.

The status of a plaintiff as either a convicted prisoner or pretrial detainee dictates whether his conditions of confinement are analyzed under the Eighth or Fourteenth Amendments. Claims of pretrial detainees involving alleged indifference to medical needs or unsafe conditions of confinement are considered under the Due Process Clause of the Fourteenth Amendment, but such claims by a sentenced prisoner are considered under the "cruel and unusual punishment" clause of the Eighth Amendment. *See Darnell v. Pineiro*, 849 F.3d 17, 29-34 & n.9 (2d Cir. 2017); *Lloyd v. City of New York*, 246 F. Supp. 3d 704, 717-18 (S.D.N.Y. 2017).[22] As El-Massri was a pretrial detainee at all times relevant to this action, the Court analyzes his claims under the more lenient Fourteenth Amendment standard.

## A.    Counts One and Two: Fourteenth Amendment "Excessive Force" and Common Law Assault and Battery

### 1. "Excessive Force"

El-Massri alleges that on November 26, 2015, he complied when Lieutenants Lewis, Cacioli, and Williams commanded him to stop fighting; but Lewis and Cacioli "unreasonably deployed a chemical agent . . . to his face and eyes at close range" (without checking for any contraindications). Doc. 76 (Am. Comp.), at 4, ¶¶ 3-5.  Thereafter, Lieutenant Williams and Officer Hebert slammed him to the ground while Lewis and Cacioli continued to spray "unnecessary" amounts of chemical agent. *Id.* at ¶ 4.  "Several defendants" allegedly "placed their knees into his neck," causing El-Massri pain and difficulty breathing. *Id.* at 5, at ¶ 4. After El-Massri allegedly screamed that he could not breathe due to asthma, one defendant allegedly told

---

[22] "A pretrial detainee's claims are evaluated under the Due Process Clause because, [p]retrial detainees have not been convicted of a crime and thus may not be punished in any manner—neither cruelly and unusually nor otherwise." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (citation and internal quotation marks omitted).

him to shut the "f*** up," kicked him in the face, and slammed him into the wall. *Id.* El-Massri alleges that he could not see anything "due to excessive amounts of chemical agent in his eyes." *Id.*

In support of their motion for summary judgment, Defendants argue that Lieutenant Williams and Correction Officer Hebert applied force that was "justified" for penological purposes – *i.e.,* to end the dangerous conflict between El-Massri and another inmate. Doc. 120-1 (Defs.' Memo), at 16. Said force was not excessive in that El-Massri simply sustained a "superficial laceration under his right eye" and no back or neck injuries. *Id.* The Defendants further assert that El-Massri was unable to identity the person(s) who allegedly brought him down to the ground or took other physical measures to obtain his compliance. *Id.* at 17-18. Defendants claim that if he cannot prove who the allegedly offending officers were, summary judgment should enter on behalf of the defendants he has named, here Williams and Hebert. *Id.* at 17-18

It is "well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)). Because "personal involvement is a question of fact[,] . . . summary judgment may be granted only if no issues of material fact exist and the defendant[ ] is entitled to judgment as a matter of law." *Id.* (quoting *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir.1986)).

Furthermore, in order for a pretrial detainee, like El-Massri, to state an "excessive force" claim under the Fourteenth Amendment, the plaintiff "must show … that the force purposely or knowingly used against him was objectively unreasonable." *Fletcher v. City of New London*, No. 3:16-CV-241 (MPS), 2018 WL 4604306, at *10 (D. Conn. Sept. 25, 2018) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 396-397 (2015)). "[O]bjective reasonableness turns on the 'facts and

circumstances of each particular case.'" *Id.* (quoting *Kingsley*, 576 U.S. at 397).

In *Kingsley*, the United States Supreme Court identified several relevant factors a court may consider in determining the reasonableness or unreasonableness of the force used:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Kingsley*, 576 U.S. at 397.  "[T]he appropriate standard for a pretrial detainee's excessive force claim is solely an objective one." *Id.* The determination regarding objective reasonableness is "made from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with 20/20 vision of hindsight." *Id.*

In the case at bar, Defendants maintain that the use of force by Williams and Hebert to bring El-Massri to the ground was justified because they were faced with two inmates "in an aggressive and combative stance."  Doc. 120-1 (Defs.' Memo), at 16 (citing Defs.' Ex. G, Incident Reports, at 5).  After all, "a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators." *Whitley v. Albers*, 475 U.S. 312, 321 (1986) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349, n. 14 (1981)).  As Defendants note, "Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security," *Whitley*, 475 U.S. at 321-22. *See* Doc. 120-1 (Defs.' Memo), at 16.

In contrast, El-Massri denies that he ignored the correctional staff's commands to stop fighting. His verified complaint states that he "complied [with the commands] by backing up and raising his hands."  Doc. 76 (Am. Compl.), at 4, ¶ 3.  El-Massri has also provided the affidavit of another inmate, Phillip Graham, to corroborate his story.  Graham averred that he witnessed the correctional staff slam El-Massri to the floor; and the staff "were telling [El-Massri] to calm down

21

but he was just standing there."[23] Doc. 200-2 (Pl.'s Supp. Response, Ex. 43, Graham Aff.), at ¶ 9. In other words, "[t]hey were treating him like he was the aggressor but he was not." *Id.*

As further corroboration, the incident reports show that El-Massri and his co-combatant did eventually stop fighting and comply with verbal commands to lie down on the floor after Lieutenants Cacioli and Lewis deployed OC spray to their facial areas. Doc. 120-2 ("Defs.' Rule 56(a)), at ¶ 15; Doc. 120-10 (Defs.' Ex. G, Incident Reports), at 4-7.

Based on the record of conflicting facts presented, the Court will deny the Defendants' motion for summary judgment on El-Massri's claim of "excessive force" against Cacioli, Lewis, Williams, and Hebert on the merits. In considering a motion for summary judgment, the Court cannot render credibility assessments as to the parties' disputed versions of the events at issue in this matter, which must be determined by a jury. *See Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 2017) ("Credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.").

In the case at bar, the Court cannot fully determine the objective reasonableness of the amount of force taken by Cacioli, Lewis, Williams, and Hebert as the facts material to this

---

[23] Defendants contend that Graham's statement should be "disregarded" by the Court because "at the time the events occurred," when questioned by Lieutenant Williams, "he could not recount the events and further, refused to provide any statement regarding what had occurred." Doc. 204 (Defs.' Reply Memo), at 4 (citing Doc. 204-1, "Supplemental Williams Aff.," at ¶¶ 10, 13). However, the Court notes that such refusal simply goes to credibility; and Defendants themselves suggest that Graham may have "feared retribution from the correctional officers." *Id.*

However, as to a second proffered affidavit by inmate Danzel Cross, the Court accepts Defendants' offer of proof that Cross was not physically present at NHCC to observe the disputed events on November 26, 2015. *Id.* at 3-4. According to prison records produced, Cross was housed in the Manson Youth Institution on November 26, 2015, so he could not have observed the events at issue. *See* Doc. 204-3 (Record of prison movements of "Cross, Danzel," including move on 11/25/2015 from NHCC to Manson YI). The Court will not consider the Cross Declaration [Doc. 200-1] in finding the facts applicable to this motion.

consideration are in dispute. The witnesses at bar have provided conflicting accounts of what occurred. Moreover, the full sequence of events on November 26, 2015, do not appear on the videos, which commence only after El-Massri was secured in wrist restraints. The volatility of the fight between El-Massri and the other inmate, the deployment of OC spray, and the placement of El-Massri on the ground were not shown.

According to Defendants' account, on November 26, 2015, Cacioli, Lewis, and Williams commanded that El-Massri and another inmate stop fighting, but the inmates failed to "cease their combative actions." Doc. 120-2 (Defs.' Rule 56(a)); Doc. 120-10 (Incident Report), at 5. One of these defendants then released the OC spray into the room where the inmates were fighting, but the fight continued. Doc. 120-2 (Defs.' Rule 56(a)), ¶¶ 12-13. Lieutenants Cacioli and Williams then entered the day room, deployed more OC spray, and gave the inmates a "verbal direction to lay on the ground." *Id*. at ¶ 14. Plaintiff allegedly "complied" with that direction, enabling Williams and Hebert to secure him with wrist restraints, lift him to his feet, and secure him to a wall. *Id.* at ¶¶ 15-17.

In contrast, El-Massri states that on November 26, 2015, defendants Cacioli, Williams, and Lewis commanded him to "stop fighting to which he promptly complied by backing up and raising his hands." Doc. 76 (Am. Compl.), at 4, ¶ 4. Lewis and Cacioli then "unreasonably deployed chemical agent . . . directly into [his] face and eyes at close range." *Id*. After Cacioli and Lewis sprayed him repeatedly, Williams and Hebert "slammed [Plaintiff] onto his face." *Id.* While he remained pinned to the ground, "several defendants forcefully placed their knees into his neck, which caused him breathing difficulty. *Id.* at 5, ¶ 4. Afterward, one defendant "kicked him in his face." *Id.*

At the time of the events at bar, Plaintiff was "an unsentenced pre-trial detainee." Doc. 76

(Am. Compl.), at 1, ¶1. With respect to a pretrial detainee, the Fourteenth Amendment, the "touchstone of due process," bars the use of excessive force – "the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Edrei v. Maguire*, 892 F.3d 525, 533 (2d Cir. 2018) (citations and internal quotation marks omitted). This "standard is most readily satisfied when conduct is intended to injure in some way unjustifiable by any government interest." *Id.* (citations and internal quotation marks omitted).

In the instant case, reviewing the facts presented by the parties, there is a genuine dispute of material fact as to whether Williams, Hebert, Lewis and Cacioli employed "excessive force," including *inter alia* deploying excessive quantities of OC spray, directing the spray into Plaintiff's face, slamming Plaintiff to the ground, and kicking his face. Also, there is a genuine dispute as to whether Defendants acted pursuant to a genuine penological interest in maintaining safety or with an intent to harm. Accordingly, what acts occurred, and in what manner, will be questions of fact for a jury. At trial, El-Massri must prove that each Defendant exerted unreasonable force in violation of the Fourteenth Amendment. The Court will leave El-Massri to his proof.[24]

Accordingly, the Defendants' "Motion for Summary Judgment" [Doc. 120] on El-Massri's Fourteenth Amendment claim against Williams, Hebert, Lewis and Cacioli for use of "excessive force" will be denied.

### 2. Failure to Intervene

As to "failure to intervene" – to prevent others from using "excessive force" – against Nurse Goode and Officer McGivney, Plaintiff has conceded that the claim should not proceed against Goode so summary judgment will enter for Goode on that claim. *See* Doc. 143 (Pl.'s Opp. Memo), at 35-36 ("Plaintiff concedes that the defendant Goode[']s failure to intervene . . . [is]

---

[24] In allowing this claim to proceed, the Court voices no opinion on its merits or potential success at trial.

more appropriately couched in the deliberate indifference/medical claims[.]").   In contrast, Plaintiff has indicated that he persists in his "failure to intervene" claim against McGivney. *Id.* at 35.

To establish a claim under § 1983 for a prison official's failure to intervene where "excessive force" is being used by another officer, a plaintiff must prove that: "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer [did] not take reasonable steps to intervene" to prevent the harm. *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008) (citations omitted), *aff'd sub nom. Jean-Laurent v. Wilkerson,* 461 F. App'x 18 (2d Cir. 2012).

In his Affidavit, McGivney has indicated that he was present when the OC spray was deployed against El-Massri.  Doc. 143-3 (Pl.'s Ex. 5, McGivney Resp. to Interrog.), ¶ 2.  When asked if he witnessed Lewis and Cacioli deploying chemical agent in El-Massri's face, McGivney admitted, "I do recall chemical agent being deployed." *Id.*  If a reasonable officer would find that the OC deployment constituted "excessive force" and McGivney had a realistic opportunity to intervene but failed to do so, he may be liable on this claim.  Because there are genuine disputes regarding the facts of the November 26, 2015 incident of OC spray (whether it constituted "excessive force") and McGivney's specific location at the relevant times and ability and/or need to intervene, summary judgment will be denied on the "failure to intervene" claim against McGivney.

### 3.  Common Law Assault and Battery

As to his third claim, Plaintiff asserts that Defendants Williams, Hebert, Lewis and Cacioli subjected him to assault and battery during the November 26, 2015 incident.  Doc. 143 (Pl.'s Opp.

Memo), at 27.  In short, he "alleges that Lewis and Cacioli sprayed chemical agent directly in his face at close range, and that Williams and Hebert slammed him face first to the ground . . . and kicked him in the face while he was already subdued and compliant." *Id.*

 "To prevail on a claim for assault and battery, plaintiff must establish that a defendant applied force or violence to him and that the application of such force or violence was unlawful." *Betancourt v. Slavin*, 676 F. Supp. 2d 71, 80 (D. Conn. 2009) (citing *Williams v. Lopes*, 64 F.Supp.2d 37, 47 (D.Conn.1999)); *Alston v. Daniels*, No. 3:15-CV-669 (CSH), 2015 WL 7257896, at *9 (D. Conn. Nov. 17, 2015) (same).

In the case at bar, the alleged assault and battery was committed against a pretrial detainee, who was engaged in combat with a fellow inmate.  "[E]xcept for § 1983's requirement that the tort be committed under color of state law, the essential elements of [excessive force and state law assault and battery claims are] substantially identical." *Humphrey v. Landers*, 344 F. App'x 686, 688 (2d Cir. 2009) (quoting *Posr v. Doherty*, 944 F.2d 91, 94–95 (2d Cir.1991)).  Therefore, to succeed on his "assault and battery" claim, Plaintiff must prove the elements of his § 1983 "excessive force" claim.

Because the Court has found that genuine issues of material fact exist as to Plaintiff's claim of "excessive force," it necessarily follows that there remain questions as to the reasonableness of defendants' use of physical force and OC spray pursuant to state law.  *See, e.g., Betancourt*, 676 F. Supp. 2d at 80 (denying summary judgment on excessive force claim, noting that the claims of assault and battery were "tightly interwoven" with excessive force); *Chalco v. Belair*, No. 3:15-CV-340, 2017 WL 2408122, at *6 (D. Conn. June 1, 2017) ("Where genuine issues of fact preclude summary judgment on the Plaintiff's excessive force claim, summary judgment on the common law claim for assault and battery generally must also be denied.").

26

For the same reasons the Court will deny summary judgment on El-Massri's Fourteenth Amendment claim of "excessive force" against Williams, Hebert, Lewis and Cacioli, it will deny summary judgment as to his claims of assault and battery against those individuals. Plaintiff will be left to his proof at trial.

## B.   Counts Three and Four:   Failure to Provide Shower – Fourteenth Amendment Conditions of Confinement

El-Massri alleges that his Fourteenth Amendment due process rights were violated when, immediately following the OC spray incident, he was escorted to the "center corridors shower" but was only permitted to have water "splashed" into his face for about five to ten seconds and was not provided with new clothing prior to his escort to the RHU. Doc. 76 (Am. Compl.) at 6, ¶¶ 6-7. In addition, he alleges that during the following three days in the RHU (Foxtrot Unit Center #1), he repeatedly requested a shower, but his requests were denied; he thus suffered for those days with burning skin and difficulty breathing due to the OC spray. *Id.* at 8, ¶ 10.  Furthermore, El-Massri alleges extended, ongoing suffering from an irritating and painful skin disorder and baldness as a result of the defendants' conduct.[25] *Id.* at 9, ¶ 13.

The Court permitted El-Massri's claims concerning the deprivation of a shower in the RHU to proceed as both Fourteenth Amendment conditions of confinement and medical indifference claims. To set forth a claim under the Fourteenth Amendment for deliberate indifference to health and safety, a plaintiff must allege facts to satisfy two prongs: (1) an "objective prong," showing that the plaintiff's conditions of confinement were sufficiently serious to constitute objective deprivations of the right to due process – *i.e.,* posed an unreasonable risk of serious harm to the

---

[25] This allegation relates to the extent of damages suffered by El-Massri due to the Defendants' alleged failure to permit him to shower for three days after the incident on November 26, 2015. *El-Massri*, 2019 WL 3491639, at *10.

plaintiff, and (2) a "*mens rea* prong" or "mental element prong," showing that the state actor's conduct amounted to "deliberate indifference to the challenged conditions." *See Darnell*, 849 F. 3d at 29.

Under the objective prong, a detainee must allege that "the conditions, either alone or in combination, pose[d] an unreasonable risk of serious damage to his health ... which includes the risk of serious damage to physical and mental soundness." *Id.* at 30 (citations and internal quotation marks). A district court evaluates the conditions to which the detainee was exposed in the context of contemporary standards of decency and addresses, *inter alia*, whether the detainee has been deprived of "basic human needs" including, for example, "food, clothing, shelter, medical care, and reasonable safety," or has been subjected to "an unreasonable risk" of serious harm to his or her future health. *Id.* (citations and internal quotation marks omitted).

"A claim for deliberate indifference to medical need[s] can be brought pursuant to the Due Process Clause's substantive protections." *Chalco v. Belair*, No. 3:15-CV-340, 2017 WL 2408122, at *5 (D. Conn. June 1, 20177).  Under the Fourteenth Amendment analysis, the "serious medical need standard contemplates a condition of urgency such as one that may produce death, degeneration, or extreme pain."  *Charles v. Orange Cnty.*, 925 F.3d 73, 86 (2d Cir. 2019). To determine whether a medical need is sufficiently serious to be cognizable as a basis for a constitutional claim for deprivation of medical care, the court should "consider factors such as whether a reasonable doctor or patient would find the injury important and worthy of treatment, whether the medical condition significantly affects the individual's daily activities, and whether the illness or injury inflicts chronic and substantial pain."  *Charles*, 925 F.3d at 86. "In most cases, the actual medical consequences that flow from the denial of care are highly relevant in determining whether the denial of treatment subjected the detainee to a significant risk of serious

harm." *Id.* at 86.

Relevant to the second, subjective or "*mens rea,*" factor, "the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35. At the same time, "negligence ... does not, without more, engender a constitutional claim." *Sanders v. Laplante*, No. 3:19-cv-01151 (CSH), 2019 WL 5538118, at *3 (D. Conn. Oct. 25, 2019). *See also Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 849 (1998) ("[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."); *Darnell*, 849 F.3d at 36 ("[A]ny § 1983 claim for a violation of due process requires proof of a *mens rea* greater than mere negligence.").

The Defendants' motion for summary judgment argues that Williams, Cacioli, Hebert, Lewis, McGivney and Goode either lacked personal involvement or did not act with the requisite state of mind to deprive El-Massri of a shower during the three days he was confined in the RHU. Doc. 120-1 (Defs.' Memo), at 6-12. The Defendants do not address (although they do not concede) the issue of whether the El-Massri's deprivation of a shower for three days after exposure to OC spray satisfies the objective component of the Fourteenth Amendment analysis. *Id.* at 6.

### 1. Video Surveillance Footage

El-Massri maintains that video surveillance footage submitted by the Defendants under seal (Doc. 103) shows that his hair was dry and he remained covered with orange/red chemical agent in a contaminated shirt (slung over his shoulder) after he was allegedly decontaminated in the shower. Doc. 143 (Pl.'s Memo), at 12-13; Doc. 142 (Pl.'s Rule 56(a)), at ¶ 56. He asserts further that the video surveillance footage reveals that he was struggling to breathe so was only

able to climb stairs because he was supported by Correction Officers McGivney and Hebert.  Doc. 143 (Pl.'s Memo), at 17. He also claims that the surveillance footage confirms that he had no scarring on his back on November 26, 2015. *Id.* at 18.

When the parties present conflicting versions of an incident and video evidence of the incident has been submitted on a motion for summary judgment, it is incumbent on the Court to view the facts "in the light depicted" by the video of the incident. *See Scott v. Harris,* 550 U.S. 372, 380–81 (2007). The first video commences after El-Massri has been confined in handcuffs and is being escorted to the shower. Video 1. The video shows El-Massri wearing a white shirt stained with orange OC spray  and pushed up over his exposed right shoulder; he appears to be having difficulty breathing as his chest is heaving at times and he is coughing; and he even expresses that he is having difficulty breathing. Video 1 at :01 to 2:37. A staff member (presumably, Nurse Goode) provides verbal assistance to El-Massri, instructing him to breathe slowly. *Id.* at 1:36-2:10. The first video ends as El-Massri is being instructed to step slowly into the shower, and El-Massri can be seen complying with this instruction while keeping his eyes tightly shut. *Id.* at 2:44.

The second video begins with El-Massri having his face wiped; Lieutenant Lewis explains that the prior video recording had terminated because the original camera lacked "battery space" and that El-Massri has been decontaminated and is waiting for clearance for RHU placement. Video 2 at :01 to :30. El-Massri is seen with his eyes tightly shut, coughing at times, and still wearing the same stained white shirt hiked up over his right shoulder in the same position as seen in the first video prior to decontamination efforts. *Id.* Nurse Goode examines El-Massri briefly and clears him for RHU placement. *Id.* at :32 -1:07. El-Massri is then seen being escorted by two correctional officers (presumably, Hebert and McGivney) while handcuffed behind his back. *Id.*

at 1:07 -2:42. Later, El-Massri can be heard talking rapidly about his interaction with the other inmate prior to his fight, stating that he generally does not bother anyone. *Id.* at 3:00- 4:01. During the escort up the stairs to the RHU, heavy breathing can be heard (although it is unclear that El-Massri is breathing heavily), and El-Massri appears to be held by the correction officers during the ascent. *Id.* at 4:11-5:08. He is placed in his RHU cell and told to take his clothing off for a strip search;[26] an officer (presumably, Lieutenant Lewis) indicates that the mace stained white shirt will be thrown out and will be replaced by a clean shirt. *Id.* at 5:08-8:02.

Upon review, the Court concludes that, on the whole, the two videos do not present a clear depiction of the events such that no reasonable jury could believe El-Massri's claim that his skin and breathing were afflicted as continuing effects of OC spray due to inadequate decontamination. Taking each Defendant separately, the Court will examine the video evidence and documentary record to determine whether any Defendant is entitled to entry of summary judgment on El-Massri's Fourteenth Amendment claims of unconstitutional conditions and indifference to his serious medical needs.

At the outset, the Court notes that there is a genuine dispute as to the severity of Plaintiff's symptoms following the OC spray incident.  El-Massri alleges that he suffered chronic pain and difficulty breathing for three days and nights following the incident due to the "burn [of] the chemical agent."[27] Doc. 76 (Am. Compl.), at 7-8, ¶¶ 9-10.  There is evidence in the video that he experienced distress in breathing. Video 1 at :01 to 2:37.  Moreover, in his verified complaint, he avers that he continues to "suffer[ ] with an extremely irratating [sic] and painful skin disorder," a

---

[26] The Court cannot discern the contents of the comments made during the escort.

[27] Plaintiff has summarized in his "Memorandum in Opposition to Summary Judgment" that he had "intense pain for 7 hours while contaminated with chemical agent, exacerbated asthma, permanent scarring, permanent bald spots in his hair, and chronic ongoing extremely painful dermatitis." Doc. 143 ("Pl.'s Memo in Opp."), at 7.

"permanent injury and disability that causes burning red inflammation, severe scarring all over his body, and bald spots in his hair."  Doc. 76 (Am. Compl.), at 9, ¶ 12.

In contrast, Defendants assert, through Nurse Goode, that Plaintiff experienced only common reactions to OC spray.  He recollected that El-Massri did initially complain of difficulty breathing prior to being decontaminated in the shower, which is consistent with exposure to OC spray.  Doc. 120-2 (Defs.' Rule 56(a)), at ¶¶ 57-58. However, El-Massri "did not present with any signs or symptoms of asthma exacerbation." *Id.* at ¶ 59.  Goode gave El-Massri verbal direction to stabilize his breathing and observed "no audible wheezing or other symptoms or signs that were not consistent with a normal reaction to OC exposure." *Id.* at ¶ 62.  Goode made no statements regarding a subsequent skin condition or post-spray pain and suffering.

Given the facts demonstrated on summary judgement, including the verified Complaint, declarations, and videos, there remains a genuine dispute as to whether El-Massri experienced a "serious" medical need as the result of delayed or denied showering to remove OC spray.  By alleging burning pain and other continuing conditions from the OC spray, El-Massri has alleged a "serious" medical need – one that has produced degeneration and/or extreme pain.  *Hill v. Curcione*, 657 F.3d 116, 122–23 (2d Cir. 2011).  "[C]hronic and substantial pain," resulting from a skin affliction, may "significantly affect[ ] an individual's daily activities," *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998).  Plaintiff will thus be left to his proof regarding this alleged "serious" condition with respect to any deliberate indifference claims that survive this summary judgment motion.

### 2. Defendants

#### a.  Lieutenant Cacioli

With respect to the subjective or *mens rea* component of Plaintiff's deliberate indifference

claim – whether the defendant was "subjectively reckless" – El-Massri alleges that he spoke with Lieutenant Cacioli on the date of the incident, November 26, 2015, at both 7:00 and 11:00 p.m. Doc. 76 (Am. Compl.), at 7, ¶ 7.  However, Lieutenant Cacioli refused to permit him to shower each time.  *Id.*  In particular, El-Massri maintains that he requested a shower from Cacioli several times. Doc. 142 (Pl.'s Rule 56(a)), at ¶ 30. He avers that at 7:00 p.m.  he asked Lieutenant Cacioli to be taken to shower because OC spray was "burning" him, but Cacioli responded that El-Massri would "not get a shower for three days." Doc. 143-1 (Pl.'s Ex. 1, "Pl.'s Decl.") at ¶ 35; Doc. 143-6 (Pl.'s Ex. 37, Pl.'s Depo.), at 23: 6-9.  El-Massri also testified that at 11:00 p.m., he spoke with Lieutenants Lewis and Cacioli as they toured the unit, asking both officers if he could please shower because "[t]his is burning me." Doc. 143-6 (Pl.'s Depo.), at 23: 8-13.  They responded, "No, you're not getting a shower." *Id.* at 11-13.   El-Massri also avers that he "continued to suffer from migraines and burning skin" after November 27, 2015, and "sp[oke] to everyone [who] passed [his] door," including Cacioli. Doc. 143-1 (Pl.'s Decl.), at ¶ 41.

It is undisputed that Lieutenant Cacioli was not involved with El-Massri's initial decontamination process and did not oversee his escort to the RHU. Doc. 120-2 (Defs.' Rule 56(a)1), at ¶¶ 24, 25, 26, 27, 28; Doc. 142 (Pl.'s Local Rule 56(a)2), at ¶¶ 24, 25, 26, 27, 28. With respect to his duty shifts on November 26 to 29, 2015, Cacioli recalls no requests from El-Massri indicating he was unable to shower, issues related to the OC spray exposure, or requests for decontamination. Doc. 120-2 (Defs.' Local Rule 56(a)1), at ¶ 30.   Cacioli was thus allegedly unaware of the substantial risk that El-Massri's health was threatened with a serious harm.

As to actual showers during the "November 27 to 29" time frame, the record remains unclear.  Although the RHU log book during that period indicates that El-Massri was provided with a shower on November 27, 2015, in the morning for over fifteen minutes, Doc. 120-2 (Defs.'

Local 56(a)1), at ¶ 31, El-Massri's deposition testimony indicates that he was not afforded such a shower, Doc. 143-6 (Pl.'s Depo.), at 23: 14-23. Moreover, the Defendants have failed to provide any declaration or affidavit from an individual who can attest, based on personal knowledge, that El-Massri was afforded a shower as reflected in the log book. Thus, in light of El-Massri's testimony, the log book entry provides no conclusive proof that he was provided with a shower on November 27, 2015.

In fact, El-Massri's deposition testimony and declaration present evidence of disputed material facts regarding whether: (1) he asked and alerted Lieutenant Cacioli that he was suffering from the effects of the OC spray while in the RHU on November 26, 2015; (2) he was actually denied a shower on November 27, 2015, despite the log book entry; and/or (3) he sought a shower from Cacioli subsequent to November 26, 2015, but was refused even after explaining that he was suffering. Accordingly, based on the conflicting record, the Court cannot find that no reasonable juror could conclude that Lieutenant Cacioli ignored – knew or should have known of – an excessive risk to El-Massri's health and safety and thereby failed to act with reasonable care to mitigate that risk (*i.e.,* by affording him access to shower). *See Darnell*, 849 F.3d at 35.

A jury must be presented with the conflicting facts and assess the credibility of both Lieutenant Cacioli and El-Massri to determine whether Cacioli acted with deliberate indifference to a significant risk of harm to El-Massri, one which could have been remedied by access to a shower. The Court will deny Defendants' motion for summary judgment on the Fourteenth Amendment unconstitutional condition of confinement and deliberate indifference claims against Cacioli.

### b. Lieutenant Lewis

El-Massri avers that on November 26, 2015, Lieutenant Lewis and others mocked and

ignored his complaint that he was suffering from the effects of OC spray exposure.  Specifically, upon initial placement in RHU, he informed them that his skin was "on fire and . . . very painful" but was told that he would not get a shower for three days. Doc. 143-1 (Pl.'s Decl.), at ¶¶ 27-31; Doc. 143-6 (Pl.'s Ex. 37, Pl.'s Depo.), at 22:  20-25. In his deposition, El-Massri stated that at 11:00 pm on November 26, 2015, he spoke with Lieutenant Lewis (and Lieutenant Cacioli), again requesting a shower to alleviate the pain caused by the OC spray, but his request was refused. Doc. 143-6 (Pl.'s Depo.), at 23: 9-13.  In addition, El-Massri's declaration asserts that during the following two days, he continued to discuss his burning skin and migraines with Lieutenant Lewis, but he received no shower so that his skin became inflamed. Doc. 143-1 (Pl.'s Decl.), at ¶¶ 41, 42. On the next day, November 27, El-Massri claims he asked Lieutenant Lewis to permit him to shower while Lewis toured the RHU, but Lewis just laughed and instructed another officer to record in the log book that El-Massri either "doesn't get a shower" or "already took a shower." Doc. 76 (Am. Compl.) at 7, ¶ 7; Doc. 143-6 (Pl.'s Depo.), at 23: 14-23.

The Defendants maintain that Lieutenant Lewis did not act unreasonably in relying on the observations and assessments of Nurse Goode, a medical professional, after El-Massri was cleared for RHU placement.  Doc. 120-1 (Defs.' Memo), at 11. However, El-Massri's testimony asserts that he alerted Lewis on both November 26 and 27, 2015, that he was experiencing "a lot of pain" and needed a shower.   Doc. 143-1 (Pl.'s Decl.), at ¶¶ 40-41; Doc. 146-3 (Pl.'s Depo.), at 23: 9-23.

Construing the record in the light most favorable to El-Massri, the non-moving party, the Court concludes that El-Massri's evidence raises genuine issues of material fact regarding Lieutenant Lewis's awareness of El-Massri's condition and need for a shower to decontaminate from OC spray.  Based on the present record, a reasonable jury could thus conclude that Lieutenant Lewis acted with deliberate indifference to El-Massri's unhealthy condition of confinement and/or

serious medical need by refusing him the opportunity to shower. Accordingly, the Defendants' motion for summary judgment will be denied on the Fourteenth Amendment deliberate indifference claims against Lieutenant Lewis.

### c. Correction Officers Hebert and McGivney

El-Massri alleges that he informed Correction Officers Hebert and McGivney about his suffering from the effects of the OC spray and need for a shower after he was placed in the RHU cell and strip-searched. Doc. 76 (Am. Comp.), at 7, ¶ 9. El-Massri's declaration provides that he informed Lieutenant Hebert that his skin was "on fire and . . . very painful" while he was in the RHU cell. Doc. 143-1 (Pl.'s Decl.), at ¶¶ 27-31. However, Correction Officers Hebert and McGivney laughed in response and took no action as to his request. *Id.* at ¶ 31.

The Defendants argue that Correction Officers Hebert and McGivney reasonably believed that El-Massri had been provided with adequate decontamination prior to his RHU escort. Doc. 120-1 (Defs.' Memo), at 7-8. Based on prescribed prison decontamination practices, as outlined in Administrative Directive 6.5, by the time they helped to escort Plaintiff to the RHU, they were under the "reasonable objective belief that substantial compliance with [that] directive" meant that decontamination efforts had been reasonably performed, obviating the need for a full shower. *Id.* at 7.

Construing the record most favorably to El-Massri, the evidence raises questions of material fact regarding whether Correction Officers Hebert and McGivney were aware of El-Massri's suffering from OC exposure when they failed to grant his alleged request for a shower in RHU. Accordingly, the Court will deny the motion for summary judgment on these Fourteenth Amendment conditions of confinement and medical indifference claims against Hebert and McGivney. A jury must resolve the disputed issues relevant to whether these two defendants acted

intentionally or recklessly by failing to mitigate a condition they knew or should have known posed a risk of harm to El-Massri. *See, e.g., Howard v. Flagstar Bank*, No. 3:19-CV-01071 (SVN), 2022 WL 1185729, at *1 (D. Conn. Apr. 20, 2022) ("[T]he Court DENIES Defendant's motion for summary judgment, as genuine issues of material fact remain for the jury to decide.") (emphasis in original).

### d.  Lieutenant Williams

El-Massri claims that during his three days of RHU confinement, he requested the opportunity to shower, but his request was denied by nurses, officers, and lieutenants, including Lieutenant Williams. Doc. 76 (Am. Compl.). at 8, ¶ 10; Doc. 143-1 (Pl.'s Decl.), at ¶ 41. Defendants argue that Lieutenant Williams was "not part" of El-Massri's decontamination process. Doc. 120-1 (Defs. Memo), at 9.  Williams testified that although he toured the RHU during El-Massri's confinement therein, he was "not personally aware that [El-Massri] requested decontamination" or "a shower." Doc. 120-4 (Ex. A, Williams Aff.), at ¶¶ 26-30.

The facts presented by the parties thus create contrasting versions as to whether Williams was aware that the OC spray continued to pose a serious risk of harm to El-Massri and failed to allow him to shower. A jury must resolve issues of credibility in situations where material facts are disputed.  The Court will thus deny the motion for summary judgment on El-Massri's Fourteenth Amendment indifference claims against Lieutenant Williams.

### e.  Nurse Goode

El-Massri alleges that Nurse Goode cleared him for RHU placement without further treatment. Doc. 76 (Am. Compl.), at 7, ¶ 8. In his declaration, El-Massri explains that he informed Nurse Goode of his asthma and difficulty breathing while he was being escorted to the shower; and after the shower, he again informed Nurse Goode that he had asthma and was struggling to

breathe. Doc. 143-1 (Pl.'s Decl.), at ¶¶ 18-19, 23. El-Massri avers that thereafter, once Lieutenant Lewis and Officers Hebert and McGivney left his RHU cell, he saw Nurse Goode again and informed him about his difficulty breathing, severe asthma, burning skin, and need for a shower. *Id.* at ¶ 32; Doc. 76 (Am. Compl.), at 8, ¶ 10. Nurse Goode allegedly responded, "that's what [you] get for fighting" and then indicated that he would check El-Massri's medical file. Doc. 143-1 (Pl.'s Decl.), at ¶ 32.

The Defendants assert that Nurse Goode adequately assessed El-Massri medically after his altercation on November 26, 2015. Doc. 120-1 (Defs.' Memo.), at 9. Goode testified that he determined that although El- Massri experienced some effects of the OC spray, the "sensation of difficulty breathing is consistent with exposure to OC." Doc. 120- 8 (Goode Aff.), at ¶¶ 28-29. Moreover, in El- Massri's case, there were "no signs or symptoms of asthma exacerbation." *Id*. at ¶ 30. Once Goode gave El-Massri "verbal direction to stabilize his breathing," Plaintiff did not demonstrate "any audible wheezing or other symptoms or signs that were not consistent with a normal reaction to OC exposure." *Id.* at ¶ 33. Furthermore, after El-Massri was placed in RHU, Goode toured that unit later that day, November 26, 2015, and "did not note any complaints of an emergent nature." *Id.* at ¶ 38.

The video evidence confirms that Nurse Goode assisted El-Massri with regulating his breathing and checked him prior to clearing him for placement in the RHU after decontamination. *See* Videos 1 at 1:36-2:10; Video 2 at :32-1:07. The video evidence further reveals that El-Massri was able to speak rapidly and without difficulty after being cleared for RHU placement. Video 2 at 3:00- 4:01. In addition, the video evidence shows that El-Massri was able to climb the stairs to the RHU without stopping (even if he was being held by the correctional officers); and the video evidence does *not* show that El-Massri was out of breath when he reached the RHU and during his

placement in the cell. *Id*. at 4:11-8:02

El-Massri's Fourteenth Amendment claim challenges Nurse Goode's medical assessment of his condition after exposure to OC spray. However, El-Massri is essentially asserting a difference of opinion as to a medical judgment made by Nurse Goode. Such a difference of opinion fails to constitute indifference or reckless disregard to an excessive risk of harm to El-Massri's health. *See, e.g.*, *Roice v. Cty. of Fulton,* No. 19-358-PR, 2020 WL 582373, at *2–3 (2d Cir. Feb. 6, 2020) ("And absent the necessary *mens rea* showing, [pretrial detainee's Fourteenth Amendment] claim is based merely on differences of opinion over matters of medical judgment, which fail to rise to the level of a § 1983 violation.") (internal quotation marks and citations omitted).

If Nurse Goode misjudged the severity of El-Massri's condition at the time he cleared him for RHU placement, such misjudgment constitutes negligence at most. Neither negligence, nor medical malpractice meet the second prong of a Fourteenth Amendment medical needs claim. *Feliciano v. Anderson*, No. 15-CV-4106 (LTS) (JLC), 2017 WL 1189747, at *13 (S.D.N.Y. Mar. 30, 2017) ("As was the case before *Darnell,* the defendants' actions [must be] more than merely negligent.") (citation and internal quotation marks omitted). Accordingly, the Court will enter summary judgment for Nurse Goode on Plaintiff's claim regarding Goode's medical assessment.

However, because El-Massri's declaration raises a disputed issue of material fact regarding Nurse Goode's awareness about El-Massri's suffering from the OC spray exposure while confined in his RHU cell, the Court will deny the motion for summary judgment on El-Massri's Fourteenth Amendment conditions of confinement and serious medical needs claims with respect only to alleged indifference to El-Massri's need for a shower for three days while he was in the RHU. *See* Doc. 143-1 (Pl.'s Decl.), at 6-7, ¶ 32.

## C.  Count Five:  Failure to Supervise against Deputy Warden Marmora

El-Massri alleges that Deputy Warden Marmora was grossly negligent in her supervision and training of the correctional officer defendants, whose alleged conduct resulted in the asserted Fourteenth Amendment violations. Doc. 76 (Am. Compl.) at 9, ¶ 12. In support of summary judgment, Defendants argue that Marmora had no substantive involvement in the alleged constitutional violations. Doc. 120-1 (Defs.' Memo), at 13-14.

In its "Initial Review Order" [Doc. 9], the Court considered whether El-Massri's allegations satisfied any of the tests for a plaintiff to establish the personal involvement of a supervisor in a constitutional violation as articulated in *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) and its progeny. *El-Massri v. New Haven Corr. Ctr.*, No. 3:18-CV-1249 (CSH), 2018 WL 4604308, at *10 (D. Conn. Sept. 25, 2018)(citing *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)).[28]  At that time, the Court permitted the constitutional claims to proceed against Deputy Warden Marmora because El-Massri had alleged that "Marmora learned of the alleged constitutional violations and failed to remedy them, condoned of a policy or custom of excessive force through the use of chemical agents, and/or supervised her subordinates in such a fashion that

---

[28] The Court's "Initial Review Order" stated:

A plaintiff who sues a supervisory official in his individual capacity for monetary damages under section 1983 must allege that the official was "personally involved in the constitutional deprivation in one of five ways:  (1) the official directly participated in the deprivation; (2) the official learned about the deprivation through a report or appeal and failed to remedy the wrong; (3) the official created or perpetuated a policy or custom under which unconstitutional practices occurred; (4) the official was grossly negligent in managing subordinates who caused the unlawful condition or event; or (5) the official 'demonstrate[d] gross negligence or deliberate indifference to the constitutional rights of [the] inmate[] by failing to act on information indicating that unconstitutional practices [we]re taking place." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994).

*El-Massri*, 2018 WL 4604308, at *10.

they caused Plaintiff's alleged unlawful conditions." *Id.*

In *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. Dec. 28, 2020), the Second Circuit clarified that a "plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 618 (citation and internal quotation marks omitted). Thus, a constitutional violation "must be established against the supervisory official directly." *Id.*

The Defendants have now provided Marmora's Affidavit in which she has averred that as Deputy Warden in 2015, she "oversaw counseling staff, maintenance, classification and records" but "did not have any authority or control over custody staff or issues involving custody." Doc. 120-9 (Defs.' Ex. F, Marmora Aff.), at ¶¶ 4-6.  In her Affidavit, she also explained that she was not at NHCC on November 26, 2015, but was notified by telephone of the event concerning El-Massri, "as [was] routine" because the event "occurred after hours." *Id.* at ¶¶ 7, 10. She also stated that although her name appears on the second page of the incident report to "reflect that [she was] contacted," she did not sign that report. *Id.* at ¶¶ 11, 14; Doc. 120-10 (Defs.' Ex. G, Incident Report), at 4.

In addition, Marmora has represented that she did not review the relevant incident report to determine whether the appropriate level of force was used during the incident; rather, she considered the report "at a later time to determine if any transfers of inmates or if separation profiles were needed." Doc. 120-9 (Marmora Aff.), at ¶¶ 12-13. She further testified that she was not aware that El-Massri had requested a shower between November 26 and 29, 2015, for purposes of decontamination.  *Id.* at ¶ 17.

El-Massri has acknowledged that Marmora was neither aware of his "excessive force" allegations nor his alleged need for a decontamination shower till days after the incident.  In his

declaration, he stated that more than a week after he was released from the RHU, he wrote an inmate request to Marmora about how he "was treated by officers and lack of decontamination for three days" but he received no response thereto. Doc. 143-1 (Pl.'s Ex. 1, Pl.'s Decl.), at ¶ 45.

In these circumstances, Marmora's post-incident notification about El-Massri's alleged deprivations is insufficient to raise an inference that she had any direct involvement with the alleged Fourteenth Amendment violations. *See Andrews v. Gates,* No. 3:17-CV-1233 (SRU), 2019 WL 2930063, at *8 (D. Conn. July 8, 2019) ("[T]he supervisory defendants were not present during the assault nor were responsible for the failure to follow established procedures. Although [plaintiff] notified each of them after the assault, notice after the fact of an isolated incident is insufficient to establish supervisory liability.").  *See also Rahman v. Fisher*, 607 F. Supp. 2d 580, 585 (S.D.N.Y. 2009) ("After the fact notice of a violation of an inmate's rights is insufficient to establish a supervisor's liability for the violation. Receiving post hoc notice does not constitute personal involvement in the unconstitutional activity and cannot be said to have proximately caused the damage suffered by the inmate.").

Furthermore, El-Massri has failed to demonstrate that Marmora had the capacity to remedy the alleged Fourteenth Amendment violation; and even assuming *arguendo* that she had such capacity, he has not shown that the alleged violations were ongoing so that she could have remedied the violations but failed to do so. *See Burton v. Lynch*, 664 F. Supp. 2d 349, 360 (S.D.N.Y. 2009) ("[A]lleged constitutional violation complained of . . . must be 'ongoing' in order to find personal involvement, such that the 'supervisory official who reviews the grievance can remedy [it] directly.'") (quoting *Vega v. Artus*, 610 F.Supp.2d 185, 198 (N.D.N.Y.2009)).

Based on the present record, there is no genuine dispute that Defendant Marmora lacked direct involvement with the alleged Fourteenth Amendment violations – "excessive force" and

deliberate indifference to El-Massri's need to shower for decontamination. The motion for summary judgment will also be granted on the supervisory liability claims against Deputy Warden Marmora.

**D.  Qualified Immunity**

The Defendants assert the defense of qualified immunity on the Fourteenth Amendment claims of "excessive force" against Lieutenant Williams, Correction Officer Hebert, Lieutenant Cacioli, and Lieutenant Lewis. Doc. 120-1 (Defs.' Memo), at 22-23. They also argue that the Defendants are entitled to qualified immunity on El-Massri's Fourteenth Amendment deliberate indifference claims based on failure to permit him to shower for three days after his exposure to the OC spray. *Id.* at 24.  In support of this defense, Defendants cite Conn. Gen. Stat. § 4-165, which states that "no state office or employee shall be personally liable for damage or injury, not wanton, reckless or malicious, caused in the discharge of his or her duties or within the scope of his or her employment." *Id.* at 23-24.

When public officials invoke qualified immunity at the summary judgment stage, courts must consider: "(1) whether the evidence, viewed in the light most favorable to the plaintiff, makes out a violation of a statutory or constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." *Cugini v. City of New York*, 941 F.3d 604, 611 (2d Cir. 2019). To determine whether a right is clearly established, courts consider "Supreme Court decisions . . . [Second Circuit] decisions, and decisions from other circuit courts." *Simon v. City of New York*, 893 F.3d 83, 92 (2d Cir. 2018). A right is clearly established if, "at the time of the challenged conduct . . . every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). A right can be "clearly established" even without a "case

directly on point" having established that right, but existing precedent must have placed the statutory or constitutional question beyond debate. *Id.*

Even when a right is clearly established, qualified immunity protects government officials when it was objectively reasonable for them to believe that their conduct in the particular factual context at issue did not violate that clearly established right. *See Manganiello v. City of New York,* 612 F.3d 149, 165 (2d Cir. 2010). "If a reasonable officer might not have known for certain that the conduct was unlawful—then the officer is immune from liability." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017). Courts have discretion to determine which prong of the analysis to address first. *See Johnson v. Perry*, 859 F.3d 156, 170 (2d Cir. 2017).

As to application of OC spray and slamming Plaintiff to the ground, although not conceding the issue, Defendants do not argue that El-Massri has not demonstrated the violation of a clearly established constitutional right.  Doc. 120-1 (Defs.' Memo), at 22. However, they maintain that the force used by Lieutenants Lewis and Cacioli was objectively reasonable because "the officers were facing a dangerous situation where despite an initial burst of OC spray, both combatants continued fighting." *Id.* at 23.  The officers allegedly acted due to "concerns that either inmate could cause injury to another inmate or to DOC personnel." *Id.*  The use of force was warranted in circumstances with a "heighten[ed] sense of danger." *Id.*

Because the qualified immunity analysis turns on the factual questions in dispute – whether the circumstances necessitated use of force and the actual force employed by these Defendants – the Court cannot conclude at this juncture that it was objectively reasonable for Defendants to believe their conduct did not violate the Fourteenth Amendment. *See Soto v. Gaudett*, 862 F.3d 148, 155, 161 (2d Cir. 2017) (affirming trial court's determination that assessment of defendants' credibility required jury trial and that Court could not, therefore, grant summary judgment on the

basis of qualified immunity); *Jefferson v. Reddish*, 718 F. App'x 94, 95 (2d Cir. 2018) (concluding issues concerning circumstances of constitutional violation precluded "determining whether the officers are entitled to qualified immunity").   The Court will not grant summary judgment regarding Defendants' alleged use of "excessive force" based on qualified immunity.

With respect to the Fourteenth Amendment deliberate indifference claims for failure to provide El-Massri with a shower for three days, the Defendants maintain that they acted reasonably because they believed that El-Massri had been decontaminated in accordance with DOC policy, was medically cleared for placement in the RHU, and had his clothing removed. Doc. 120-1 (Defs.' Memo), at 24. However, the Court has concluded that the record reflects conflicting factual versions regarding whether Defendants were actually aware of El-Massri's alleged need to shower due to suffering from OC spray effects. Accordingly, consistent with its prior discussion, these factual issues also preclude the Court from entering summary judgment in the Defendants' favor based on qualified immunity for El-Massri's Fourteenth Amendment deliberate indifference claims.

## V.    CONCLUSION

For the foregoing reasons, the Defendants' "Motion for Summary Judgment" [Doc. 120] is GRANTED in part and DENIED in part. The Court GRANTS summary judgment on all Fourteenth Amendment claims against Deputy Warden Marmora, the Fourteenth Amendment claim against Nurse Goode for failure to intervene in the use of "excessive force," and the Fourteenth Amendment claim against Nurse Goode based on his medical assessment (decision to clear El-Massri for RHU placement).[29] The dismissal of these claims is WITH PREJUDICE.  The

---

[29] As described *supra*, the Court denies summary judgment as to Nurse Goode on El-Massri's Fourteenth Amendment conditions of confinement and serious medical needs claims with respect to Goode's alleged indifference to El-Massri's need for a shower for three days while he was in the RHU.  *See* Part IV.B.2.e herein.

Motion for Summary Judgment is DENIED as to all other claims.

The case may proceed to trial on the following claims:  (1) Fourteenth Amendment "excessive force" (against Williams, Cacioli, Hebert, and Lewis); (2) Fourteenth Amendment for failure to intervene to prevent use of "excessive force" (against McGivney), (3) Connecticut common law assault and battery (against Williams, Cacioli, Hebert, and Lewis); (4) Fourteenth Amendment conditions of confinement and deliberate indifference to serious medical needs (against Williams, Cacioli, Hebert, Lewis, Goode, and McGivney) regarding failure to permit El-Massri to shower for three days.  Within thirty (30) days of this Ruling, the parties shall file a notice with the Court stating whether they are interested in renewing settlement discussions or proceeding directly to trial.

It is **SO ORDERED**.

Dated: New Haven, Connecticut
       October 7, 2022

*/s/Charles S. Haight, Jr.*
CHARLES S. HAIGHT, JR.
Senior United States District Judge